FERNANDO BARRERAS, demandante y recurrido, *v.* MIGUEL SANTANA y UNITED BENEFIT FIRE INSURANCE COMPANY, demandados y recurrente la segunda.

*Número:* 520. *Resuelto:* 8 de febrero de 1963.

*José Trías Monge, R. H. Francis* y *Horacio R. Subirá,* abogados de la compañía de seguros recurrente; *Rafael A. González,* abogado del recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

No hay controversia sobre los hechos. Un caballo propiedad del codemandado Miguel Santana causó daños a otro caballo propiedad del demandante Fernando Barreras debido a la negligencia de los empleados del codemandado Santana mientras ambos ejemplares se encontraban entrenándose en la pista del hipódromo "El Comandante". Las lesiones sufridas por el caballo del demandante fueron de tal naturaleza que fue necesario sacrificar al animal. Ambos dueños de los caballos mencionados eran a la fecha de los hechos miembros de la Asociación Hípica de Puerto Rico. La codemandada United Benefit Fire Insurance Company, de Omaha, Nebraska, era, mediante una sola póliza, la aseguradora de la Asociación Hípica y de sus miembros.

En el Tribunal Superior el demandante obtuvo sentencia contra Santana y la compañía aseguradora por $5,000.00 más costas y $500 de honorarios de abogado. Recurre ante nos la compañía y sostiene que ese riesgo estaba excluido de la póliza por los términos expresos de la misma y que por lo tanto la sentencia contra ella es improcedente.

La póliza, que está redactada en inglés, fue expedida a la "Asociación Hípica de Puerto Rico and/or Individual Members" (Asociación Hípica de Puerto Rico y/o sus miembros individuales). De acuerdo con sus términos la aseguradora viene obligada a lo siguiente: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined." (A pagar en nombre del asegurado cualquier suma que el asegurado venga obligado a pagar por concepto de daños o destrucción de propiedades, incluyendo la pérdida del uso de la misma, causados accidentalmente y que surjan de los riesgos aquí especificados.)

Al referirse a los riesgos cubiertos por la póliza ésta los define como "The ownership . . . or use of . . . private and race horses (per horse)." (La posesión . . . o uso de caballos y caballos de carreras, por cada caballo.) En sus cláusulas de exclusión la póliza expresa que la misma no es aplicable "to injury or destruction of (1) property owned or occupied by or rented to the insured, or (2) . . . property used by the insured, . . ." (a daños o destrucción de (1) propiedad poseída u ocupada por, o arrendada al asegurado, o (2) a propiedad utilizada por el asegurado . . . ).

La posición de la compañía aseguradora es la siguiente: La póliza cubre daños a la propiedad pero no cubre daños a la propiedad del asegurado; como el demandante Barreras es un asegurado por lo tanto la póliza no cubre daños a su propiedad.

El demandante replica: La debilidad del razonamiento del demandado consiste en que el demandante no está reclamando daños a la compañía en virtud de la póliza existente entre él (el demandante) y la compañía. Dentro de esa relación contractual él es el asegurado y no podría, debido a los términos de la póliza, reclamar a la compañía por los daños sufridos por su propiedad; sino que la compañía respondería por los daños que él (demandante y asegurado) causare a la propiedad de otros. Pero el caso es que el demandante está reclamando daños causádoles por una persona que a su vez es un asegurado de la compañía y por quien la compañía se obligó a responder. En otras palabras, el demandante está reclamando bajo los términos de la póliza existente entre la compañía y el demandado, y no bajo los términos de la póliza entre el demandante y la compañía.

Confrontados así con dos interpretaciones distintas y atendibles del contrato de seguro en cuestión y no existiendo una solución en el texto del mismo para la controversia planteada, forzosamente tenemos que interpretarlo. Como señala Couch raro es el pleito de seguros en que para decidirlo

no haya que interpretar alguna cláusula de la póliza. 1 Couch *On Insurance* 2d, p. 637.

■ Es regla general en materia de contratación que en caso de obscuridad en el texto de un contrato, su interpretación no deberá favorecer a la parte que la hubiese ocasionado, Art. 1240 del Código Civil, 31 L.P.R.A. sec. 3478; *Torres* v. *P. R. Racing Corp.*, 40 D.P.R. 441, 444 (1930). Dicha regla tiene mayor vigencia que de ordinario en el campo de seguros. *Aparicio* v. *Asociación de Maestros*, 73 D.P.R. 596, 602 (1952); *Susoni Vda. de O'Neill* v. *Pac. Woodmen Life Ass'n*, 51 D.P.R. 537, 541 (1937); *Mutual Life Insurance Co.* v. *Hurni Packing Co.*, 263 U.S. 167, 174 (1923); *Thompson* v. *Phenix Insurance Co.*, 136 U.S. 287, 297 (1889); *First National Bank* v. *Hartford Fire Insurance Co.*, 95 U.S. 674, 678–679 (1877); *Mass. Protective Ass'n* v. *Bayersdorfer*, 105 F.2d 595, 597 (1939); *Heyward* v. *American Casualty Co.*, 129 F. Supp. 4, 8 (1955); *Farley* v. *American Auto Ins. Co.*, 72 S.E.2d 520, 521 (1952); *Aetna Life Ins. Co.* v. *Padgett*, 176 S.E. 702, 703 (1934).

■ Richards expresa que no hay regla de interpretación de los contratos de seguros que esté más firmemente establecida que la que dispone que cuando el contrato es susceptible de dos interpretaciones debe utilizarse la que más favorezca al asegurado, 3 Richards *On Insurance* 5ta. ed., 1952, pág. 1314 y autoridades allí citadas. También en sentido parecido se expresa Vance, quien señala que dicha regla de interpretación en favor del asegurado es sostenida casi sin excepción por los tribunales y que debido a que son tantas las decisiones que han ratificado dicha regla sería prácticamente imposible citarlas todas. Vance *On Insurance*, 3ra. ed., 1951, pág. 809. Basta con examinar las anotaciones sobre el particular que aparecen en las obras citadas en el curso de esta opinión para darse cuenta de que ello es cierto y de que sería ocioso citar tan crecido número de casos. Sobre el particular puede verse también I Couch *On Insurance* 2d, págs. 658 y 661–662.

■ La regla general antes mencionada preceptiva de que la obscuridad en la redacción de los contratos no deberá favorecer a la parte que la hubiese ocasionado opera, como dijimos, más rigurosamente en el caso de los contratos de seguros por ser éstos contratos de adhesión. Así están considerados tanto en el derecho civil como en el derecho común anglosajón. En derecho civil, Puig Brutau lo señala explícitamente y dice que el contrato de seguro "es un contrato de adhesión . . . en el sentido . . . de que el asegurado no puede alterar con el juego normal de la previa negociación las condiciones que en esta clase de contratos median con carácter general. Por esta razón la jurisprudencia ha declarado que por ser prácticamente el contrato de seguro un contrato de adhesión, en caso de duda sobre la significación de las cláusulas generales de una póliza redactada por la compañía aseguradora, debe aceptarse la interpretación más favorable al asegurado." *Fundamentos de Derecho Civil*, Tomo II, Vol. II, ed. 1956, pág. 486. Castán los menciona como ejemplos "muy frecuentes de contratos de adhesión." *Derecho Civil Español, Común y Foral*, Tomo III, 8a. ed., 1954, pág. 332. Véanse también las sentencias del Tribunal Supremo de España de 13 de diciembre de 1934 y de 27 de febrero y de 6 de marzo de 1942.

En el derecho común Vance, obra citada, pág. 243, lo expresa con claridad y realismo:

"El rigor con que los tribunales aplican a las pólizas de seguros la regla preceptiva de que los términos del contrato se interpretarán vigorosamente contra la parte que lo redactó se entenderá mejor si se recuerda que las pólizas de seguros son contratos de adhesión. Esto es, los términos del contrato de seguro no son producto de la negociación mutua entre las partes y dichos términos no expresan verdaderamente un acuerdo al que las partes hayan llegado. Generalmente esos términos están prefijados en un impreso preparado por la compañía aseguradora, o por disposición de ley, y el asegurado se 'adhiere' a los mismos si desea pero no puede variarlos. Aplicarle en forma estricta al asegurado unos términos o condicio-

nes en cuya redacción él no tomó parte, y cuyo significado frecuentemente él no puede entender, resultaría a menudo en grandes injusticias, cosa que los tribunales detestan hacer."

Véase además Patterson, *"The Delivery of a Life Insurance Policy"*, 33 Harv. L. Rev. 198, 222 (1919) ; el Comentario en 35 Yale L. J. 203, 205, 206 (1926) ; Ehrenzweig, *"Adhesion Contracts in the Conflict of Laws,"* 53 Colum. L. Rev. 1072, 1082 (1953).

▉ Igualmente están considerados como contratos de adhesión los contratos de seguros en Puerto Rico, (*Maryland Cas'y Co.* v. *San Juan Rac'g Assoc., Inc.*, 83 D.P.R. 559 (1961), en donde en varios aspectos del derecho se va elaborando una síntesis de los dos sistemas jurídicos antes mencionados. (¹)

▉ A la luz del derecho existente sobre esta situación veamos el contrato que nos ocupa. El mismo fue expedido a la

---

(¹) Los interesados en el tema harían bien en ver Castán, *"En Torno al Derecho Civil de Puerto Rico"*, 26 Rev. Jur. U.P.R. 7 (1956); Hood, *"Louisiana and the Civil Law: A Crossroad in Louisiana History"*, 22 La. L. Rev. 709 (1962); Tate, *"Techniques of Judicial Interpretation in Louisiana"*, 22 La. L. Rev. 727 (1962); Ortiz, *"El Derecho Como Vehículo de Expresión de Nuestra Cultura"*, 5 Revista del Colegio de Abogados de Puerto Rico 133 (1940); Rodríguez Ramos, *"Reexamen del Precedente Judicial en Puerto Rico"*, 15 Rev. C. Abo. P. R. 7 (1954) y Pound, *"Comparative Law and History as Bases for Chinese Law"*, 61 Harv. L. Rev. 749 (1948). "When, therefore, I urge that, instead of exact imitation or detailed importation of the law of any country of today, courts and jurists make of the codes a Chinese law, developed as such by Chinese Jurists, and interpreted and applied by Chinese judges as so developed, I do not mean that China is to recede from the stand taken when the codes were framed and adopted and make a new start on the basis of her historical institutions, but that interpretation and application of her codes are not to be blindly borrowed from, even· if much influenced by, the interpretation and application of modern codes elsewhere. It is to be remembered that they are Chinese codes, to be applied to the Chinese people, to govern Chinese life. Moreover, a modern system of law is made up not only of authoritative legal precepts and an authoritative technique, but also of authoritative, received ideals, that is, received pictures of the society in which the system of law obtains, in the light of which starting points for legal reasoning are chosen, precepts are interpreted, standards are applied, and judicial discretion is exercised." *Ibid,* p. 757 *in fine.* Para notas históricas sobre nuestro derecho v. Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil*

234

"Asociación Hípica de Puerto Rico *y/o sus miembros indivi-duales*" (subrayado nuestro). El resultado de utilizar combinadas en esa forma la conjunción copulativa "y" y la conjunción disyuntiva "o" es, como cuestión de hecho, crear tres pólizas; o sea, quedan asegurados (1) la Asociación como tal, (2) la Asociación y sus miembros, y (3) los miembros de la Asociación. *Bobrow* v. *United States Casualty Co.*, 246 N.Y.S. 363, 366 *in fine* (1930); *Schaeffer* v. *City Bank Farmer's Trust Co.*, 267 N.Y.S. 551, 554 (1933); y *Anotación* en 118 A.L.R. 1367, 1369. *A fortiori*, si el efecto de esa fórmula gramatical fuese crear duda en cuanto a su interpretación entonces la misma se resolvería a favor del asegurado, a tenor con los criterios antes expresados sobre el particular.

de *Puerto Rico*, 1947; Muñoz Morales, *Compendio de Legislación Puertorriqueña y sus Precedentes*, 1948; Rodríguez Ramos, *"Breve Historia de los Códigos Puertorriqueños"*, 19 Rev. Jur. U.P.R. 233 (1950).

En su discurso pronunciado en el Colegio de Abogados de Puerto Rico en el año 1948 el Decano Rodríguez Ramos señaló la necesidad de reformular nuestro derecho en lugar de hacer meras compilaciones como se había estado haciendo por varias décadas. 18 Rev. Jur. U.P.R. 22 (1948). La Asamblea Legislativa de Puerto Rico tiene a su haber un impresionante número de leyes mediante las cuales ha reformulado importantes aspectos de nuestro derecho. Ejemplos de estas leyes son: *Ley de la Judicatura* (1952) 4 L.P.R.A. sec. 1 y ss.; *Ley de Contratos de Refacción Industrial y Comercial* ("The Factors' Lien Act") (1954) 10 L.P.R.A. sec. 551 y ss.; *Ley Uniforme de Recibos de Fideicomiso* ("Uniform Trust Receipt Act") (1954) 10 L.P.R.A. sec. 611 y ss.; *Ley de Contribuciones Sobre Ingresos* (1954) 13 L.P.R.A. sec. 3001 y ss; *Ley Notarial* (1956) 4 L.P.R.A. sec. 1001 y ss.; *Ley General de Corporaciones* (1956) 14 L.P.R.A. sec. 1101 y ss.; *Código de Seguros* (1957) 26 L.P.R.A. sec. 101 y ss.; *Ley de Relaciones del Trabajo* (1945) 29 L.P.R.A. sec. 61 y ss.; *Ley de la Propiedad Horizontal* (1958) 31 L.P.R.A. |sec. 1291 y ss.; *Ley de Vehículos y Tránsito* (1960) 9 L.P.R.A. sec. 301 y ss.; *Ley de Salario Mínimo* (1956) 29 L.P.R.A. sec. 245 y ss.; *Ley Municipal* (1961) 21 L.P.R.A. sec. 1101 y ss.; *Ley de Servicio Público* (1962) 27 L.P.R.A. sec. 1001 y ss.

También como parte de esta reformulación del derecho puertorriqueño deben mencionarse las *Reglas de Procedimiento Civil* (1958) adoptadas por el Tribunal Supremo y remitidas a la Asamblea Legislativa, conforme la Sección 6 del Art. V de la Constitución; las nuevas *Reglas de Procedimiento Criminal* adoptadas por el Tribunal Supremo pero no vigentes aún; y las nuevas *Reglas de Evidencia* que están bajo la consideración del Tribunal.

 El propósito de la póliza es proveer protección al asegurado, Vance, obra citada, p. 258. Por eso las cláusulas de exclusión se interpretan restrictivamente. *Matteson et al.* v. *Johnson et al.*, 11 Automobile Cases 2d 1229, 1230, Wis. Supreme Ct. (1957). Las dudas se resolverán de modo que se realice el propósito de la póliza, *Equitable Life Assur. Soc. of United States* v. *Adams*, 83 S.W.2d 461, 464 (1935); *Locomotive Engineers M.L. & A. Ins. Asso.* v. *Vandergriff*, 91 S.W.2d 271, 273 (1936), y no se favorecen las interpretaciones sutiles para evadir la responsabilidad, *Carl Ingalls Inc.* v. *Hartford Fire Ins. Co.*, 31 P.2d 414, 416 (1934);[2] en cambio se buscará el sentido o significado que a las palabras de la póliza le daría una persona normal de inteligencia promedio que fuese a comprar la póliza, *Equitable Life Assur. Soc. of United States, etc.*, supra, p. 464; *Mutual Life Ins. Co. of New York* v. *Smith*, 79 S.W.2d 28, 32 (1935); *Jefferson Standard Life Ins. Co.* v. *Hurt*, 72 S.W.2d 20, 23 (1934); 13 Appleman, *Insurance Law and Practice*, pp. 27–28. Como señala el demandante, la Asociación como tal difícilmente puede causar los daños contra los cuales los miembros de la misma querían protegerse. Debe ser claro que la póliza fue comprada para proteger a los dueños de los caballos miembros de la Asociación de los daños que estos animales pudiesen causar. Esa relación está implícita en el acto de compra de la póliza. Se ha resuelto que lo que está implícito en el contrato de seguro es tan parte del contrato como si se hubiese escrito. *Schott* v. *Continental Auto Ins. Underwriters*, 31 S.W.2d 7, 13 (1930).

 Además, suponiendo que hubiese conflicto entre las cláusulas en controversia, la cláusula de exclusión aparece en la parte impresa del contrato mientras que la parte que incluye como asegurado al demandante, en su calidad de *miembro individual* de la Asociación ("and/or individual

---

[2] "A risk fairly within contemplation is not to be avoided by any nice distinction or artificial refinement in the use of words." *Carl Ingalls Inc., etc.*, supra, p. 416.

236

members") está escrita en maquinilla en el contrato y fue redactada especialmente para esta póliza. Esas partes redactadas especialmente en las pólizas prevalecen sobre las cláusulas impresas cuando entre unas y otras hay conflicto. La razón es que en cuanto a esas partes escritas especialmente ha habido mayor asentimiento o acuerdo de voluntades ("meeting of the minds") entre las partes contratantes que en cuanto a las partes impresas del contrato. *Hagan v. Scottish Insurance Company*, 186 U.S. 423, 428 (1902); *Thomas v. Taggart*, 209 U.S. 385, 389 (1908); *Fireman's Fund Ins. Co. v. Globe Navigation Co., et al. The Nottingham*, 236 F. 618, 633 (1916); Couch, obra y tomo citados, pp. 772–773 y 775.

■ Por las razones aducidas creemos que la posición del demandante, antes expresada, es la correcta. La codemandada no responde al codemandado Santana, bajo los términos de su póliza con él, de los daños que sus caballos pudiesen sufrir pues ese riesgo está excluído de la póliza, pero sí responde de los daños que los caballos de su asegurado Santana causaren a otro, y ese otro en este caso es el demandante.

*La sentencia del Tribunal Superior, Sala de San Juan, dictada en este caso en 5 de mayo de 1961 será confirmada.*