**PUERTO RICO ELECTRIC POWER AUTHORITY, Plaintiff,**

v.

**Jeremy Hew PHILIPPS, Defendant.**

Civ. No. 83–0606 (JAF).

United States District Court, D. Puerto Rico.

Oct. 10, 1986.

Pedro Santiago-Torres, San Juan, P.R., for plaintiff.

Vicente Santori-Coll, San Juan, P.R., for defendant.

## MEMORANDUM OPINION AND ORDER

FUSTE, District Judge.

On April 4, 1983, the Puerto Rico Electric Power Authority ("PREPA") brought this declaratory judgment action against Underwriters at Lloyd's, London, later substituted by Jeremy Hew Philipps. Both parties are of diverse citizenship and the amount in controversy exceeds $10,000. 28 U.S.C. sec. 1332. This case turns on the interpretation of a general "all-risk" insurance agreement underwritten by defendant Philipps.

The issue is whether a work stoppage is an "event" under the insurance contract. If so, whether acts of vandalism or sabotage occurring on different dates are "series of losses" arising from the strike, and, therefore, treated as a "single loss" in the application of the deductibles clause. According to the complaint, PREPA filed with the insurer a damages' claim for approximately four million dollars. Defendant's refusal to pay the full amount forms the basis of the declaratory judgment action. 28 U.S.C. sec. 2201.

On July 6, 1984, the parties submitted this case for decision on a stipulation of facts. The parties averred that a majority of PREPA's employees were organized under the "Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico." During the course of a strike from December 23, 1977 through April 24, 1978, union members or employees of PREPA committed 238 separate acts of sabotage or vandalism against plaintiff's property. Exhibit "C" of the stipulation consists of a list of the disciplinary cases resulting from the strike. Criminal charges were filed against some twenty-five employees, the most recent being February 23, 1978—two months after the strike had begun. Only six of the employees were convicted on criminal charges ranging from aggravated assault to other undetermined offenses. Some were also administratively suspended or terminated from their employment with PREPA.

Insurance policy No. 5048/OM/UM2278600 provided coverage for those criminal or tortious acts committed during the strike. The parties stipulated that:

[T]he wording and/or policy language that was in full force and effect during the strike period ... was prepared and devised by PREPA [the insured] through its employees and/or agents and/or brokers and/or other representatives and was thereafter presented to defendant Underwriters of London for approval.

Under the terms of the contract, PREPA paid a yearly premium of $600,000 for said policy which covered against "all risks of physical loss or damage" to its property, except for some perils not relevant here. The parties limited the liability to $5,000,000 per loss, minus the applicable deductibles. The policy insured Class I and Class II properties. Class I, the object of PREPA's claims against the insurer, included transmission and distribution lines and related structures. Class II covered "all other properties." With respect to Class II, the deductible was $500,000 for "each and every loss", except for a $1,000,000 deductible for a loss caused by flood. A $1,000,000 deductible per loss applied to Class I property.

The crux of this case is the first sentence of the "Application of Deductibles" clause. It provides:

(i) *A series of losses arising from the same event shall be treated as a single loss in the application of the deductibles.* However, notwithstanding the foregoing, in the event of losses to property arising out of which separate deductibles are applicable, then such deductibles will be applicable by class of property as if the losses had occurred separately. (Emphasis added)

Putting it mildly, this contract is a model of inaccurate drafting where ambiguity reigns supreme. The terms "event" and "loss", and the phrase "a series of losses arising from the same event" are nowhere defined in the contract. This uncertainty is compounded by the fact that a strike is not

included or excluded in the contract as an insured risk or peril. PREPA's contention before the insurer, and now before us, is that a strike represents an "event." As such, 238 acts of vandalism allegedly are a "series of losses" proximately caused by the strike and, thus, only one deductible applying to the totality of the damages. Philipps argues that, rather than the strike, each act of vandalism or sabotage is an "event" subject to individual deductibles. The broad coverage urged by plaintiff as to an "event" in the "Application of Deductibles" clause, is disconcerting when read in light of clauses d(ii), (iii), which state:

> (ii) In respect of windstorm losses (which loss shall mean physical loss or damage arising directly or indirectly from wind, cyclone, hurricane, rain, tornado, hail, snowstorm and blizzard) the *limit of liability and deductible shall apply to the amount of loss or damage which occurs during any one period of 48 consecutive hours.* (Emphasis added)

> (iii) In respect of earthquake losses, the *limit of liability and deductible shall apply to the amount of loss or damage, which occurs during any one period [of] 72 consecutive hours.* (Emphasis added)

With a bearing on the intention of the parties to the contract, is a stipulation as to a *renewal* insurance policy also drafted by PREPA. Exhibit "B" Stipulation, Doc. No. 17. While the renewal policy did not insure against the acts of sabotage committed here, it provided coverage during the year *subsequent* to the strike. Without the ambiguity characteristic of the policy under consideration, the renewal contract provided *explicit* insurance coverage for "riot attending strike." *See generally,* G. Couch, *Cyclopedia of Insurance Law* sec. 42.462 at 556 (2d ed. 1982) (such policy may cover damages to merchandise and intentional destruction of goods during a strike). For purposes of the insurance limits and the deductibles clause in the renewal policy, an "occurrence" encompassed "all acts of vandalism and malicious damage occurring during the course of one strike." *See* Appendix "A" to this opinion.

## I.

We begin by clarifying the applicable body of Puerto Rico law which, under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court must follow in a diversity case. The Insurance Code of Puerto Rico, 26 L.P.R.A. secs. 101–4024, controls the interpretation of insurance contracts. *Banco de la Vivienda v. Pagán Ins. Underwriters,* 111 D.P.R. 1, 6 (1981). The Civil Code of Puerto Rico (1930) is suppletory law to any deficiency in the Code of Insurance. *Id.* In *Municipality of San Juan v. Great American Ins. Co.,* —— D.P.R. ——, ——, 86 J.T.S. 64 at 4461 (1986), the Supreme Court of Puerto Rico acknowledged a strong persuasive value of the common law in the interpretation of insurance contracts, noting the formative influence of other jurisdictions, including the Anglo-American, in our Code of Insurance. *Cf. Valle v. Amer. Intern. Ins. Co.,* 108 D.P.R. 692 (1979) (Civil Code applies in full force to tort actions).

This court cannot literally ascertain from a reading of the insurance policy whether tortious or criminal acts, the alleged results of a strike, are a "single loss" in the application of the deductibles. Therefore, the terms of the contract must be read together and harmonized to arrive at the intention of the parties. Art. 1237, Civil Code of Puerto Rico (1930) ("C.C."), 31 L.P.R.A. sec. 3475. *Cervecería Corona v. Commonwealth Ins. Co.,* 115 D.P.R. 345, 348–49 (1984); *Carrillo Norat v. Camejo,* 107 D.P.R. 132, 138 (1978). The Code of Insurance, 26 L.P.R.A. sec. 1125, is consistent with the Civil Code in that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy." A literal reading of a contract is always disfavored when it contradicts the intention of the parties. Art. 1233 C.C., 31 L.P.R.A. sec. 3471. When a contractual obligation is ambiguous, as here, the intention of the parties controls. *See Merle v. West Bend Co.,* 97 D.P.R. 403, 409–11

(1969). The parties' intentions can be demonstrated by their conduct, both prior and subsequent to the contract. Art. 1234 C.C., 31 L.P.R.A. sec. 3472. *Pagán Ins. Underwriters*, 111 D.P.R. at 6–7. The parole evidence rule would not be a bar in such case to the admissibility of documentary evidence relevant to the parties' intentions. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 69–70 (1983). Under the *Marina* framework, for example, the terms of the renewal policy are admissible to help explain why PREPA failed to bargain for a "riot attending strike" clause in the original contract.

■ We turn now to a critical issue that is preliminary to the merits of this case, i.e., whether the insurance policy should be interpreted most favorably to PREPA, the insured, despite PREPA having caused the ambiguities when drafting the contract. The answer is in the negative. PREPA pretends that we construe the insurance policy as an adhesion contract. When a clause in an adhesion contract is ambiguous and susceptible to different interpretations, a court must choose the one most favorable to the insured. *Ortiz v. Comisión Industrial*, 101 D.P.R. 781, 787–88 (1973). PREPA ignores, however, that an adhesion contract presupposes that the *insurer* has superior bargaining power and, as the drafter of the contract, is to be held accountable to the insured. *See, e.g., Pagán Ins. Underwriters, Inc.*, 111 D.P.R. at 6; *Casanova v. P.R. Amer. Ins. Co.*, 106 D.P.R. 689 (1978). We find no authority prohibiting an insurer from attempting to rebut a presumption of adhesion in an insurance contract. A commentator to the Spanish Civil Code has laid the foundation:

> If the clause involved appears to be ambiguous, it must be considered that an insurance contract is, for all practical purposes, a contract of adhesion and therefore, in case of doubt regarding the meaning of one of the general clauses in the policy (*drafted by the insurer without any participation whatsoever from the client*) one must adopt, according to article 1.288 [art. 1240 Civil Code of Puerto Rico], the most favorable interpretation [to the insured] *because the ambiguity is imputable to the insurer* . . . .

8 Manresa, *Comentarios al Código Civil Español*, vol. II at 748 (6th ed. 1967) (translation ours) (emphasis added).

■ There is no evidence here to suggest that the parties were in unequal bargaining positions. This is not a case where the client did not participate in contract formation. Manresa, *supra*. In fact, PREPA concedes that its agents drafted the insurance policy and submitted it to defendant for his approval. Because PREPA was better situated than Philipps to correct its own contractual uncertainties or needs, our interpretation of the deductibles clause will *not* favor the insured. Art. 1240 CC, 31 L.P.R.A. sec. 3478; *cf. Barreras v. Santana*, 87 D.P.R. 227, 231–32 (1963).

## II.

■ We proceed to interpret the contract.[1] An "event" is defined as:

1a(1): something that happens: OCCURRENCE . . .

2b(1): the outcome or consequence of anything: ISSUE, CONCLUSION, RESULT.

*Webster's Third New International Dictionary* 788 (1981). Under those terms, a strike is an "occurrence" or "event." Reading the first sentence of the deductibles clause in *isolation*, a "series of losses" (damages caused by vandalism) if produced by an "event" (the strike), are treated as a "single loss", and, thus, subject to one deductible. The phrase a "series of losses arising from an event" suggests that proximity in time between the strike and the criminal or tortious acts is required. The only evidence to that effect is the list of disciplinary cases processed during the

---

**1.** The parties have cited no authority on point, and we have found none, which resolves the issues before us.

strike year. Exhibit "C", Stipulation. The only conclusion that can be drawn from that evidence is that separate acts of vandalism or sabotage were indeed committed. This evidence does not show the connection, if any, between such conduct and the strike. We cannot presume causation. A preponderance of the evidence fails to show that 238 separate acts of vandalism were caused by a strike.

■ We have stated repeatedly that the first sentence of the deductibles clause cannot be read in isolation from the rest of the contract. All of the terms of the contract must be harmonized to arrive at the parties' intentions. *Carrillo Norat*, 107 D.P.R. at 138. In our view, PREPA's literal reading would have the unintended effect of creating an overbroad deductibles clause. Subsections d(ii) and (iii) of said clause contain *time* limitations for specified risks or perils. One deductible applies to "windstorm losses" that occur during 48 consecutive hours. The same result follows for "earthquake losses" during a period of 72 consecutive hours. Likewise, if one deductible had been intended for all malicious damage caused by a four-month strike, then the parties surely would have included some sort of limitation in the contract. But they did not. The renewal policy (Exhibit "B"), also corroborates that a single deductible for all acts of sabotage or vandalism attending a strike was not bargained for in the first contract. Contrary to the subsequent renewal policy, the insurance policy at issue (Exhibit "A"), is devoid of any language suggesting that malicious damage from a strike is a "single loss." The conclusion is inescapable that the parties did not intend or contemplate a strike as an "event" capable of triggering the single deductibles clause.[2]

Our holding is narrow. We simply declare that 238 acts of vandalism or sabotage are not a "single loss" within the

meaning of this contract. Accordingly, the damages caused by each tortious or criminal act are subject to individual deductibles. Declaratory judgment for defendant shall be entered dismissing the complaint.

IT IS SO ORDERED.

### APPENDIX A

The renewal policy, in its relevant part, provides:

*Section II*

B. *Policy Coverage:*

(1) *Perils Insured:* This Insurance covers against ALL RISKS of physical loss or damage from any cause except as excluded or limited hereunder.

(2) *Limits of Insurance:* This insurance, subject to the limitations and exclusions hereafter stipulated covers US $5,000,000 each and every loss EXCESS OF DEDUCTIBLES [sic] in legal currency of the United States of America, per each *occurrence.*

*Section III*

D. *Occurrence Defined:*

The term "Occurrence" shall mean one or more accidents, disasters or casualties, *arising out of or following on one event,* subject to the following clarifying definitions of the perils of Windstorm, Earthquake, *Riot, Strike,* Vandalism and Explosion. (Emphasis added)

. . . .

(4) *Riot & Strike Damage, Vandalism & Malicious Damage:*

"Riot and Strike Damage" shall mean loss of or damage to the property insured directly caused by:

(a) Any act committed in the course of a disturbance of the public peace by any [sentence incomplete in original]

(b) Any wilful act of any striker or locked-out worker done in furtherance of a strike or in resistance to a lock-out

---

**2.** PREPA claims that if a deductible of $1,000,000 applies to a damages claim for an act of vandalism, the insured would be precluded from any recovery whatsoever. We simply cannot rewrite the bad bargain struck by PREPA in this case. We also clarify that no evidentiary value has been given to a report by Gilbert Management Consultants, Inc. that favors defendant on the interpretation of the insurance policy. The admissible evidence extends only to that stipulated by the parties.

whether or not such act is committed in the course of a disturbance of the public peace; or

(c) Any act of any lawfully constituted Authority for the purpose of suppressing or minimising [sic] the consequences of any existing distrubance of the public peace, or for the purpose of preventing any such act as is referred to in (b) above or minimising [sic] the consequences therof [sic].

"Vandalism and Malicious Damage" shall mean loss of or damage to the property insured directly caused by any malicious act of any person whether or not such act is committed in the course of a disturbance of the public peace, *all acts of vandalism and malicious damage occurring during the course of one strike shall be deemed to be one occurrence.* (Emphasis added)

. . . .

*Section IV:*

*Limitations and Exclusions*

This insurance shall be modified by the following clauses:

A. *Deductible*

Each claim for loss or damage, including use and occupancy, extra expenses, expediting expenses and/or contingent use and occupancy, defined as an "occurrence" under Section II, Clause D [sic], of this insurance, shall be adjusted separately and *considered as a single claim* and, from the amount of such adjusted claim, or the applicable limit of liability, whichever is less, subject to one of the following deductibles.... (Emphasis added)