Nellie Tuttle WILES, Appellee,

v.

NATIONWIDE LIFE INSURANCE COM-
PANY, Appellant.

No. 9321.

United States Court of Appeals
Fourth Circuit.

Argued April 22, 1964.

Decided June 23, 1964.

Karl N. Hill, Jr., and Welch Jordan, Greensboro, N. C., for appellant.

J. Sam Johnson, Jr., Greensboro, N. C., for appellee.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and CRAVEN, District Judge.

CRAVEN, District Judge.

Application of credit merchandising methods to the sale of life insurance occasioned this controversy as to lapse of a life insurance policy for nonpayment of premiums. We think the district court, with the aid of a jury, fairly and according to law determined that the policy had not lapsed.

The widow of James E. Wiles, who died February 22, 1963, brought this action against Nationwide to recover the proceeds of a life insurance policy on her husband's life in the amount of $13,-205.00. Mr. J. Craig Steed, Nationwide agent at Greensboro, sold Mr. Wiles the policy in May or June of 1961. He loaned the first monthly premium in the amount of $12.60 to the applicant by ad-

vancing it to Nationwide. The policy was dated July 3, 1961. When it was delivered, Mr. Wiles paid Steed enough money to reimburse him for the first monthly premium and to pay up the August and September premiums, so that the next premium was due October 3, 1961. To facilitate collection of premiums, Nationwide then extended to the policyholder the dubious benefits of its Check-O-Matic Plan. This plan was simply an authorization by policyholder to Nationwide to present drafts to policyholder's bank each month for the amount of the premium due for that month. The authorization form included the following provisions: "IT IS UNDERSTOOD AND AGREED THAT: (1) such checks shall be drawn on or about the 16th day of each month to cover premiums falling due during such month. The cancelled checks will constitute notices of and receipts for such premiums. (2) The Check-O-Matic Plan will be discontinued if any such check is dishonored."

The first check presented to the bank under the plan, for payment of the October 3, 1961, premium, was dishonored by the bank and returned to the Company for insufficient funds. By letter dated November 22, 1961, the Company notified Wiles of the dishonored check. In the same letter, the Company advised him that it had not received the dishonored check in sufficient time to stop presentation of the November premium payment check, and that "since the November check (had) already gone through, and assuming that it is honored by your bank, we will be willing to waive" the rule automatically discontinuing the Check-O-Matic Plan upon receipt of a dishonored check. The letter further stated: "However, in order for us to do this, it will be necessary for you to send us a valid replacement payment of received, the pre-authorized check will not be sent out in $12.25 within the next 10 days. Unless such a payment is December. Assuming that the November check clears without any

difficulty, this would mean that your policy would be paid to November 3, 1961."

"Now, let us cover the possibility that the recent check will also be returned unpaid by your Bank. This would mean that your policy would be lapsed as of October 3, 1961, due to the fact that the grace period for paying that premium has already expired. However, you could take advantage of our Easy Reinstatement Offer by submitting your individual payment of $25.20 to cover the regular monthly premiums for October and November on or before November 24, 1961 * * *. Assuming that the November check is dishonored and a payment is not received from you bearing a postmark on or before November 24, 1961, we would require the formal reinstatement of your policy in order to continue it in force. In other words, current evidence of your insurability would be needed."

Before the expiration of the ten-day period allowed for payment of the premium in default, Steed, at Wiles' request, advanced the $12.25 to the Company; Wiles repayed Steed several days later. Apparently the November check cleared; no further premium payment difficulties arose until June 1962.

Thereafter, the facts will be understood better if set out chronologically:

*June 3, 1962:* Due date of the monthly premium in the amount of $12.60. Even the amount is uncertain. Sometimes the figure $12.60 is used; sometimes $12.25.

*June 16, 1962:* The Check-O-Matic Plan provides that Nationwide will draw the monthly check on or about this date.

*June 25 or 26, 1962:* Draft for premium due June 3 and supposed to issue on or about June 16 presented and dishonored at the bank for insufficient funds.

*July 2, 1962:* Policyholder cancelled the Check-O-Matic Plan and requested monthly billing.

*July 11, 1962:* Wiles received bank statement showing dishonor of a $12.25 draft.

*July 12, 1962:* Nationwide acknowledged the cancellation of the Check-O-Matic Plan and wrote in part as follows: "The 'Check-O-Matic' method of premium payments has been stopped as of July 1962 per your request. Please inform Mr. Wiles of this and explain to him that *this policy is paid to July 3, 1962.* (Emphasis ours.) Please explain to him that a premium of his choice, whether it be monthly $12.60, quarterly $36.45, semi-annual $71.85, or annual $140.25 is due at this time and he should forward one of the above immediately so that his policy will remain enforce (sic), and our records can be changed accordingly. Thank you for your help and cooperation on this."

*July 23, 1962:* Nationwide's agent receives another $12.60 premium payment, and, according to Mrs. Wiles, the payment was accompanied with a note saying: "This is to cover July payment." This payment, subsequently acknowledged by Nationwide as having been "intended for July" was nevertheless applied to the month of June and used to validate the dishonored June check.

*August 16, 1962:* Mr. Wiles paid Nationwide's agent Steed $10.00. Whether it was to be applied to reimburse Steed for advancing a premium on an automobile policy with which we are not concerned [1] or as a partial payment (balance to be advanced by Steed) of the monthly premium on the life insurance policy was the subject of conflicting evidence properly left to the jury.

1. In oral argument it was indicated that an associated Nationwide Company issued the auto policy and that premiums, whether for automobile or life insurance, went to the same regional office. But, since the facts were not developed below, we assume for purposes of this opinion a complete separation of companies.

*September 22, 1962:* Nationwide issued a notice of lapse of the policy for nonpayment of premiums. Under the label "lapse date" cryptically appear the figures "07/03/62".

*September 24, 1962* and monthly thereafter until the death of the policyholder February 22, 1963, the proper premiums were sent to Nationwide each month.

Prior to the receipt of the lapse notice (September 22, 1962), Nationwide had given neither Wiles nor its agent Steed any notification that any premium or premiums were in default.[2] Nor was the policyholder given any opportunity to use the "Easy Reinstatement Offer" (without current evidence of insurability) which had been proposed by the Company in November of the preceding year when there was a default in payment of premium.

Correspondence between the parties after the notice of lapse indicate that there was much confusion in Nationwide's own office as to the reason for the issuance of the lapse notice. Not until after Mr. Wiles' death did Nationwide settle upon the explanation that the policy had lapsed as a result of the dishonored June 1962 draft. Earlier letters were to the effect that the policy "lapsed for nonpayment of the premium due July 3, 1962". This must have perplexed Mrs. Wiles since she knew, and it was later established, that she had sent a premium payment to Steed during the latter part of July. She explained in her testimony on adverse examination and at the trial that she thought that the dishonored check (June), of which she had first received notice in July, was for payment of the July premium and that the money sent to Steed in July was intended to validate that dishonored check.

## I.

Nationwide urges that the court committed prejudicial error in permitting agent Steed to testify relative to the practice of Nationwide with regard to lapse notifications and reinstatement opportunities as follows:

"Q. All right. Now, Mr. Steed, with reference to that statement, is it not customary in the life insurance field, and particularly with this Company, when there has been a return of a check for insufficient funds or the failure to pay a premium within the grace period, is it not the custom of your Company as well as the trade in general, to give what is called a 'prior to lapse notice'?

"DEFENDANT'S ATTORNEY: Objection to that question, Your Honor.

"THE COURT: The Objection is overruled * * *.

"A. I really don't know what the policy of the Company is in respect to that particular statement. All I know is that I have had this case here that they did notify me of the check that had been returned. (Note: this is in reference to the check dishonored in October 1961.)

"Q. Now, you are familiar with the term 'prior-to-lapse notice'?

"A. Yes. That is, I assume that you mean the second notice on the policy. That is true.

"Q. And that is customarily done by life insurance companies for policyholders, is it not?

"DEFENDANT'S ATTORNEY: Objection.

"THE COURT: Overruled.

"A. Yes."

In answer to further questions propounded by the plaintiff's counsel, and over the objection of the defendant's attorney, the court permitted Mr. Steed to testify in the following respects:

"We ordinarily don't receive a letter such as this (again referring to the correspondence relating to the

2. Such notice is a prerequisite to forfeiture of the policy under North Carolina statutory law *except* as to policies on which premiums are payable monthly. G.S.N.C. § 58-207.

October 1961 check) on a prior-to-lapse notice, as you call it. We ordinarily receive a card that says the policy is about to lapse, or that the policy has lapsed, and that if the premium is received by a certain date shown on the card, then it is reinstated without any question of health."

■ Plainly Steed was testifying as to facts within his own personal knowledge. He denied knowing company policy and did not attempt to state it. The often criticized agency-hearsay rule has no application to this testimony for the simple reason that Steed made no admissions but simply related facts within his knowledge.[3]

■ It is true, as urged by Nationwide, that a custom of the life insurance business is not binding upon Nationwide unless it is also a custom of Nationwide. But certainly such evidence is competent. Existence of an industry custom supports a reasonable inference that it is likely that a member of the industry conforms to the custom. It may lack sufficient weight to show Nationwide's custom, but it is not so plainly irrelevant as to come within any rule of exclusion. Nationwide's argument comes to this: that since each item of evidence, separately considered, fails to prove custom, the policyholder should not be allowed to begin.

It is "the general rule with respect to policies requiring the periodical payment of premiums and providing for a forfeiture for failure to pay on the day named, that if the insurer customarily receives overdue premiums from the insured, and thereby induces him to believe that a forfeiture will not be incurred by a short delay in the payment of premiums, it cannot insist on a forfeiture for a delay induced by such custom." 29A Am.Jur. "Insurance" Section 1092; Hutson v. Metropolitan Life Insurance Co., 206 N.C. 325, 173 S.E. 347, 349.

Aside from Steed's testimony, there is ample evidence tending to show that the monthly premiums were customarily paid after the due date. Evidence of late premiums, of prior-to-lapse notice and easy reinstatement are pieces of the same fabric which together may amount to waiver. The objections to Steed's testimony are without merit.

## II.

■ Nationwide objects to the failure of the court to give requested instructions and also objects to those that were given. We find no prejudicial error in the charge to the jury. The trial judge has no duty to give instructions in the form requested by counsel. Indeed, it is the better practice that he couch them in his own language. Beaty Shopping Center, Inc. v. Monarch Insurance Co. of Ohio, 315 F.2d 467 (4th Cir. 1963).

■ The court correctly instructed the jury that the provision in the policy giving Nationwide the right to terminate the policy for failure to pay the premium on its due date or within the thirty-one day grace period thereafter is for the Company's benefit and that it can exercise that right or waive it. Aldridge v. Greensboro Fire Insurance Co., 194 N.C. 683, 140 S.E. 706, 708 (1927); 29 Am.Jur. "Insurance" Section 1011. The court then explained, favorably to Nationwide, that a check given in payment of a premium due does not constitute payment until the check is honored and that since the check was dishonored the latter part of June the period of grace of the June payment would have expired on July 3 or 4. Since the lapse notice itself was ambiguous and did not disclose the basis of Nationwide's forfeiture action, the court correctly instructed the jury that Nationwide would have no right to ignore the

---

**3.** See Stansbury, North Carolina Evidence, Section 169 for a sound criticism of the rule itself. Federal courts are obligated to apply the rule of evidence which favors the reception of the evidence. Fed.R.Civ.P. 43(a).

policyholder's instructions as to application of the July payment and that if the Company applied the July payment to the June payment without authority from the policyholder that it could not lawfully then cancel the policy for failure to pay the July premium. It was left to the jury to determine what actually occurred, and we find no error in these instructions.

█ Finally, the court instructed the jury as follows:

"(I)t's up to you to determine whether or not from this evidence you are satisfied by its greater weight that this custom of dealing with the insured here in the matter of payments, of giving notice to continue the time of payment without the necessity of applying for reinstatement, if you should find from this evidence and by its greater weight that such a custom did exist, then the Court instructs you that it would have been the duty of the insurance company under those circumstances to have notified the insured of the nonpayment of the June check. On the other hand, if you find from the evidence that no such custom did exist, why then no obligation would be imposed upon the insurance company to give such notice."

We think this is a substantially correct statement of the North Carolina law fairly applied to the fact controversy in this litigation. It is true that neither the North Carolina statute nor the contract of insurance required notice, but twice within four months of inception Nationwide's agent had paid premiums for the policyholder permitting him to delay payment. The due date of the premium was the 3rd day of each calendar month. Except for the first payment, the premiums for almost a year were never paid on time. The Check-O-Matic Plan, by its own terms, delayed payment from the 3rd of the month to the 16th, but in actual practice the drafts were seldom presented until about the 25th of the month. We have already noted that in November 1961, long after default in payment of premium and expiration of the grace period, Nationwide had waived the nonpayment of premium and urged the policyholder to take advantage of its "Easy Reinstatement Offer" without the necessity of current evidence of insurability. This unbroken history of late premium payment is not calculated to impress upon a policyholder that prompt payment of monthly premiums is of any great importance. Not only could the jury have properly determined that the policyholder was lulled into a false sense of security by the conduct of Nationwide and its agent, but it is clear that the confusion surrounding the premium payments after June 1962 is largely attributable to Nationwide. It is worth repeating that Nationwide requested its agent to inform its policyholder that the policy was paid to July 3, 1962. If Nationwide thought so, it should not complain that its policyholder made the same mistake.

### III.

Apparently as an afterthought, but with much zeal, Nationwide now contends that in all events the policy automatically lapsed as of September 3, 1962, for failure to pay the premium due August 3, 1962. In the pre-trial order, Nationwide contended that the only issue to be passed upon by the jury would be: "Did the policy lapse on August 3, 1962, as alleged in the Answer?" In Nationwide's request for instructions, there is no mention of any contention that lapse occurred as of September 3, 1962, for failure to pay the premium due August 3. Nationwide has never issued a lapse notice based upon the failure to pay the premium due August 3.

Nationwide urges that the burden of proof is on plaintiff to show that the policy is in full force and effect and urges that the evidence hereinabove recited about the payment of $10.00 to Steed with the request that he advance the remainder for the August 3 payment was insufficient to be submitted to the jury.

But, "(i)n the great majority of the cases, * * * which have determined upon whom lies the burden of proof as to payment or nonpayment of insurance premiums * * *, other than the first or initial premium, nonpayment is treated as an affirmative defense, with the result that where an insurer sets up nonpayment as a defense, it has the burden of sustaining the issue by proper proof." 29A Am.Jur. "Insurance" Section 1844.

With respect to payment of premiums, apparently Nationwide was relieved in the trial below of a burden of proof properly imposed upon the insurer. 29A Am. Jur. "Insurance" Section 1844. For that it cannot complain.

■ Even if it be assumed that there was nonpayment of the August 3 premium, there remains the same question of waiver considered previously. Lapse can never be automatic. To say so is to deny there can be waiver.

In Hill v. Federal Life & Casualty Co., 252 N.C. 649, 114 S.E.2d 648 (1960), the defendant insurance company urged on appeal for the first time the defense that the plaintiff was not the holder of the certificate of insurance.[4] The court held that since the case had been tried on another theory that the defendant insurance company cannot now urge to defeat plaintiff a defense which it *waived*.[5]

Since it was established at the trial that there was nonpayment of either the June 3 or July 3 premium, it is somewhat academic that there may also have been partial or total payment failure in August. The battle was joined on notice and waiver—not on literal compliance with policy terms of payment. With respect to the question of payment of the August 3 premium, it is not necessary to determine the validity of Nationwide's contention that it is not charged with responsibility for the well-established practice of its agent Steed in advancing premiums. But, in Horton v. Home Insurance Co., 122 N.C. 498, 29 S.E. 944 (1898), the North Carolina Supreme Court approvingly noted language from Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L.Ed. 617, condemning "the conduct of some insurance companies in stimulating their agents to the highest degree of activity in soliciting insurance, and then seeking to avoid responsibility for their acts and representations * * *." The court also quoted from Willis v. Germania & Hanover Fire Insurance Co., 79 N.C. 285, 289: "(T)he insured are generally plain men, without counsel or the capacity to understand the involved and complicated writings which they are required to sign, and which in most cases probably they never read. What they understand is that they are to pay the insurer so much money, and * * * the insurer pays them so much. When, therefore, there has been good faith on the part of the insured, and a substantive compliance with the contract on their part, the courts will require nothing more."

Courts are reluctant to declare the forfeiture of an insurance policy. 29A Am. Jur. "Insurance" Section 1011; 29 Am. Jur. "Insurance" Section 263. That the Supreme Court of North Carolina shares in this general reluctance in cases involving payment or nonpayment of premiums is amply demonstrated by its decisions. Cauley v. General American Life Insurance Co., 219 N.C. 398, 14 S.E. 2d 39 (1941); Boseman v. Ohio State Life Insurance Co., 211 N.C. 392, 190 S. E. 225 (1937); Ferrell v. Metropolitan Life Insurance Co., 207 N.C. 51, 175 S.E. 692 (1934).

Affirmed.

---

4. Apparently plaintiff inadvertently neglected to offer evidence of payment of first premium and issuance of the policy.

5. For other reasons, a new trial was ordered and the defendant was permitted to set up the new theory of defense upon remand.