MONSERRATE ROSARIO, Plaintiff and Appellant, *v.* ATLANTIC SOUTHERN INS. CO. OF PUERTO RICO, Defendant and Appellee.

No. R-65-13.     Decided February 26, 1968.

*Raúl Torres González* for appellant. *Luis F. Sánchez Vilella* for appellee.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Ramírez Bages.

MR. JUSTICE RIGAU delivered the opinion of the Court.

We must determine whether or not two life insurance policies were in force upon the death of the insured. This is a specialized aspect of contracting—the insurance business —and the particular facts of the case, as we shall see, are controlling in the determination of the applicable law.

On February 13, 1961, the Peninsular Life Insurance Company issued two policies in favor of Virgilio Caraballo, one an accident policy in the principal amount of $2,500 and the other an endowment policy for $500, both having a double indemnity clause in case of death caused by accident. In both policies the insured designated his wife, Monserrate Rosario, as beneficiary. Since both policies were of the type known

as industrial, the premiums were invariably collected by a sales agent of the insurance company who called at the door. The insured paid them personally and sometimes his wife paid them.[1]

After the policies were bought, but before the death of the insured occurred, the Atlantic Southern Insurance Co., defendant herein, took charge of the policies.

Upon the death of the insured, his wife, plaintiff herein, requested payment of the policies from the defendant, but the latter refused to pay adducing that when the insured died the policies were not in force because they had expired or lapsed for nonpayment of the premiums. The Superior Court rendered judgment in favor of the defendant, and we decided to review.

We have to elucidate the following points: What was, insofar as pertinent herein, the contractual relation between the insured and the insurer; what was the custom or practice established by the insurer for the collection of the premiums; and what effect, if any, did said practice have on the contractual relation aforementioned.

The policies were issued by the Peninsular Life Insurance Co. The first, designated "Comprehensive Accident Policy," contains a clause in relation to the "Payment of Premiums" which, insofar as pertinent, reads:

"The premiums are payable only to an authorized representative of the Company, and the payments of said premiums, to

---

[1] Industrial insurance is a life insurance issued in small amounts with premiums collected at frequent intervals—semi-monthly or weekly—by an agent of the company who calls at the door. The term "industrial" originally developed from the fact that the policies were sold—and are sold—to workers, poor people who could not afford to pay the premiums in quarterly or larger assessments and did not have the means or practice of making payments by checks or money orders. Mehr & Osler, Modern Life Insurance 239, Rev. ed. (1956); MacLean, Life Insurance 374, 8th ed.; Vance, On Insurance 54, 3d ed.; Keeton, Basic Insurance Law 54 (1960); 1 Appleman, Insurance Law and Practice 21, § 7 (1965); 1 Richards, Law of Insurance 431, 5th ed. (1952); I Couch, On Insurance 2d, § 1:60. For a statutory definition, see 26 L.P.R.A. § 1502.

bind the Company, must be properly made and entered by said representative in the premium receipt book corresponding to this policy. If by any reason the premium is not collected by the Company when it is due, the policyholder is bound to deliver or send said premium to the Principal Office of the Company or to one of its branch offices."

In relation to the terms of the contract, the policy contains a clause, which provides:

"This policy, including the attached endorsements and documents, if any, constitutes the entire insurance contract. No alteration to this policy shall be valid unless properly approved by an executive officer of the Company, provided said approval is endorsed on, or attached to this document. No agent is authorized to alter this Policy or waive any of its provisions."

The premium payment clause refers to the "Premium Receipt Book," in which the representative of the company shall credit the payments "to bind the Company." Neither the policy nor the premium receipt book inform the insured the address of the Company's office in Puerto Rico; they only indicate that the central office is in "Jacksonville, Florida," without further details of street and number, or post office address.

The other policy, an endowment policy for $500, contains certain clauses identical to the ones copied above from the first policy. It also gives as the sole address "Jacksonville, Florida," without further details of street and number, or post office address. The premium receipt book is the same used for the first policy. Said book was kept by the insured and the agent credited therein the payments of the premiums of both policies when he collected them.

When the *Atlantic Southern* took charge of said policies originally issued by the *Peninsular Life*, the insured was not given the address of the new company; neither in the United States nor in Puerto Rico.

The policies were issued on February 13, 1961, and the first payment was tendered that day. According to the written contract, the premiums were due weekly; 40 cents for one and 83 cents for the other. The premium receipt book also stated that they would be paid every Monday, in advance. The evidence shows that the truth is different. The visits of the company's agent to collect the premiums did not follow a regular term or pattern, but the collections were made in an irregular and unpredictable manner. Sometimes the agent called on weekly visits, but other times he let two, three, and four weeks pass, and on one occasion more than five weeks. He always collected the overdue premiums and some in advance. The last time he went there to collect the premiums, subsequent to the death of the insured, 40 days had elapsed from his last visit. On that occasion the agent, having knowledge of the death of the insured, collected the overdue premiums for 5 weeks, plus the one which would become due the following week. He made this last collection on December 3, 1962, and the preceding one on October 24 of said year. The insured died on November 29, 1962. During the complete year 1962 the agent only collected twice within the weekly plan as the contract stipulated. The practice of the agent was, then, to call for the collection irregularly, letting several weeks elapse, but not always the same number of weeks, and of collecting overdue premiums.

If at the time the insured dies the payment of the premiums is up to date, the risk is covered, of course, and no problem of this kind requiring judicial intervention should arise. It does not arise either, even though the premium is due and unpaid, if the death occurs within a period of four weeks after it is due, because during this period, called grace period, the policy is in full force by express mandate of the law. 26 L.P.R.A. § 1505. It is more probable, however, that doubts are entertained and judicial intervention required, when the insured dies subsequent to the expiration of the

grace period, leaving unpaid premiums. Such a situation is the one in the case at bar.

Having in mind the set of facts afore-recited, let us examine the prevailing law on this matter in search of the solution of the problem, that is, whether or not the policies were in force at the death of the insured.

■ Although it is true that contracts bind the executing parties and that their fulfilment cannot be left to the will of one of the parties,[2] special matters are governed by special laws and by the case law which is formed from the structure of the statutes. The Civil Code, of course, as the spinal column of our private law, always remains as a suppletory source.[3] In relation to this matter of insurance there is special legislation[4] and there is a long experience which has produced abundant case law. The two policy clauses copied above, one in relation to the payment of premiums and the other providing that the agent cannot alter the terms of the contract or waive any rights of the company, are standard clauses which literally appear in hundreds of thousands of contracts of this nature.[5] Since these contracts are so numerous and of ancient origin, it is to be expected that the clauses under consideration have been repeatedly construed. It is so indeed.

Although there are cases to the contrary,[6] the majority of the cases and the courts which have decided situations like the one at bar, in favor of plaintiff's position, is overwhelming.[7] Before examining the existing case law on situations identical to the one at bar, we shall consider first the general

---

[2] Civil Code, §§ 1208 and 1209; 31 L.P.R.A. §§ 3373 and 3374.

[3] Civil Code, § 12.

[4] See the Insurance Code of Puerto Rico, 26 L.P.R.A. § 101 *et seq.*

[5] In the year 1966 industrial policies were sold in the United States for a total amount of $40 billions. Life Insurance Fact Book 19 (1967).

[6] *Home Beneficial Assn.* v. *Lomax*, 4 F.2d 292 (1925); *Curtin* v. *John Hancock Mut. Life*, 167 N.Y.Supp. 1041 (1917).

[7] See annotation pages, arranged by states in alphabetical order, in 15 Appleman, Insurance Law and Practice, under § 8551 (Extension of

principles which the case law and the commentators have established on this matter.

■ Insurance contracts, being contracts of adhesion, are to be liberally construed in favor of the insured. *Barreras* v. *Santana,* 87 P.R.R. 215, 218–22 (1963) ; *Aparicio* v. *Teachers' Association,* 73 P.R.R. 549, 554 (1952) ; *Mutual Life Insurance Co.* v. *Hurni,* 263 U.S. 167, 174 (1923) ; Vance, On Insurance 243 (3d ed.) ; 3 Richards, On Insurance 1314 (5th ed.).

■ The courts do not favor forfeiture of insurance contracts. *Von Uhl* v. *Trempealeau County Mut. Ins. Co.,* 146 N.W. 516, 520 (1966) ; *Larson* v. *Union Central Life Ins. Co.,* 137 N.W.2d 327 (1965) ; *Efinger* v. *Order of United Commercial Travelers,* 156 So.2d 38 (1963) ; *Siebert* v. *Supreme Council of Order of Chosen Friends,* 23 Mo. App. 268 (1886).

They do not favor either the forfeiture for nonpayment of premiums. *Life & Casualty Ins. Co.* v. *Eubanks,* 94 So. 198, 199; *Manhattan Life Ins. Co.* v. *Parker,* 85 So. 298; *Mutual Life Ins. Co.* v. *Lovejoy,* 78 So. 299.

■ The principles of waiver and estoppel, which are active throughout our law, are of special application in the law of insurance on account of the adhesive nature of said contracts. Vance, *op. cit.* at 471 and authorities cited therein.

■ The policy conditions relative to the forfeiture and termination of the policies may be waived by the insurer, and the actions of the insurer and its agents may constitute such waiver. Sometimes said actions constitute estoppel to raise said conditions against the assured. *Wiles* v. *Nationwide Life Ins. Co.,* 334 F.2d 296, 300 (1964) ; *Lafargue* v. *United Royal Life Ins. Co.,* 169 So.2d 240, 242 (1964) ; *Her-*

---

Time for Payment) ; § 8553 (Particular Conduct Establishing Custom) ; § 8556 (Conduct of Agents) ; § 8558 (Custom as to Method of Payment) ; § 8560 (Collection of Premiums by Insurer) and § 8562 (Payments after Loss).

bert v. *Woodruff's Ins. Co.*, 19 So.2d 290. See the two two-column pages citing cases on this particular in 6 Couch, On Insurance 2d 496–497.

■ When the insurer or its agents customarily permit a particular practice with respect to the payment of premiums different from that stated in the written contract, it is precluded from availing itself of the strict letter of the contract against the insured, even though the contract stipulates that the agents are not authorized to alter the terms of the contract. So many cases could be cited on this matter that it would be too tedious to mention them;[8] besides, we shall soon consider specific cases identical to the one at bar.

■ It has been decided that the practice on the part of the insurance agent of receiving overdue premiums constitutes a waiver of the forfeiture clause for nonpayment of premiums, even though payments are made after the expiration of the period of grace and even though the policy may provide the contrary. *Lafargue* v. *United Royal Life Ins. Co.*, supra; *Inter-Ocean Insurance Co.* v. *Banks*, 104 So.2d 836, 838 (1958); *Friedland* v. *American Bankers Ins. Co.*, 52 P.2d 660; 6 Couch, On Insurance 2d 566 and 636; 15 Appleman, Insurance Law & Practice, §§ 8551, 8553, 8560.

■ It has been repeatedly decided that where the agent of an insurer regularly calls upon the insured for payment of premiums, the insured has a right to act upon the custom thus established and is not required to make the payments in a different manner, unless prior notice is given of the intention to abandon the custom, since said custom or practice creates in the insured a reasonable expectancy that the same custom will be observed.[9]

---

[8] See the annotation of three two-column pages in 6 Couch, On Insurance 2d 591–593, under the section "Effect of Custom and Usage."

[9] See the materials cited in the preceding footnote, the cases cited hereinafter in this opinion, and 6 Couch, On Insurance 2d 611.

As may be remembered, in the case at bar the premiums were not collected weekly in advance, as provided in the contracts, but they were collected irregularly and often overdue. There also exists in this case the additional circumstance that the defendant did not inform the insured the address where he could or should remit the payments in the event the agent failed to collect them regularly. Let us see how the courts have decided situations identical to the one at bar.

In *Lafargue v. United Royal Life Ins. Co.*, 169 So.2d 240 (1964), at the time of the insured's death the premiums were six weeks in arrears. The policy provided a four-week grace period, and according to the literal terms of the contract, the policy had lapsed. However, since the company's agent had established the custom or practice of collecting overdue premiums, the court concluded that the agent's actions were equivalent to a waiver by the company, of the forfeiture provisions of the policy, and ordered the payment of the face value thereof. There, the case of *Herbert v. Woodruff's Ins. Co.*, 19 So.2d 290, which was decided in identical manner, was cited with approval, even though, in that case, the policy expressly provided that agents cannot waive forfeiture and that receiving overdue premiums was merely an act of courtesy on the part of the insurer.

Another case identical to the one at bar is *Life & Casualty Ins. Co. v. Eubanks*, 94 So. 198 (1922). In said case, like in the case at bar, it was the custom of the insurance company to send its agent to the house of the plaintiff to collect the insurance premiums; he usually called once about every two weeks; when the accident occurred the premiums for the two preceding weeks were in arrears; the agent called after the accident and collected the premiums in arrears, having full knowledge that the insured had been injured and delivered the sick claim to the insured's wife.

In said *Eubanks* case, the contract contained the following conditions: The weekly premium of 40 cents was due every Monday, in advance; if the weekly premiums were in arrears for two weeks, the subsequent payment would only cover accidents occurring subsequent to the payment; that if the collector failed to call for the premiums due, the insured would be required to pay the same at a branch office of the company; and no collector or agent was authorized to waive forfeiture. Notice the great similarity between that case and the one at bar.

██ Notwithstanding the foregoing, the court ordered the payment of the policy. It stated that since the agent had established the custom of receiving past-due premiums, that fact constituted the insurer's waiver of forfeiture for nonpayment. It stated that the company was authorized to refuse to accept past-due premiums and raise the question of forfeiture, but in accepting past-due payments it had waived said right. In *Wiles* v. *Nationwide Life Ins. Co.*, 334 F.2d 296, 302 (1964), it was stated that lapse of policy can never be automatic, since the circumstances may show that it has been waived.

In *Carey* v. *John Hancock Mut. Life Ins. Co.*, 100 N.Y. Supp. 289 (1906), no place is specified in the policy for the payment of the premiums, but the company's practice was to send a collecting agent weekly to the house of the insured. The collector failed to call again and the insured died three months after the policy lapsed. The court understood that the custom aforementioned justified the conclusion that the policy had not, in fact, lapsed, and that in any event it was sufficient to estop the insurer from asserting a forfeiture.

In *Banker's Health & Life Ins. Co.* v. *Givvins*, 77 S.E. 203 (1913), the court, after determining there had been instances in which the company had accepted past-due assessments, it stated that such course of dealing fully authorized

the conclusion that if the insured had not died, the deferred payments which were in default at the time of his death would have been accepted. It stated that in receiving past-due payments the company induced the insured to believe that it was permissible to tender past-due payments, and it further added that it would be unjust under said circumstances to hold the policy lapsed and inoperative because there were due premiums at the time of the insured's death. Like reasoning was stated in *Adams* v. *Washington Fidelity Nat. Ins. Co.*, 173 S.E. 247 (1934).

In *Baker* v. *Michigan Mut. Protective Ass'n*, 76 N.W. 970 (1898), the agent of the company told the insured that the company would send a collector to the house of the assured between the first and the tenth of each month. On one occasion no collector came and the assured died on the 14th of the month. The court ordered the payment of the policy and it stated that it would be a gross injustice to permit the company to profit by its own default, and pointed out the significant fact that the place of payment was the home of the assured, and the latter did not have knowledge of the company's address to tender the payment otherwise.

We do not believe it necessary to continue the detailed discussion of other cases which repeat and apply the aforestated principles in the course of this opinion. In *Mayer* v. *The Mutual Life Ins. Co. of Chicago*, 18 Am. Rep. 34, they utilized the reasoning of the reasonable expectancy previously discussed. In *Vinginerra* v. *Commercial Casualty Ins. Co.*, 156 N.Y.Supp. 573, followed the decision in *Carey, supra*. See also, *Rumbeck* v. *Farmers' & Bankers' Life Ins. Co.*, 150 Pac. 586 and *Cochran* v. *National Casualty Co.*, 246 N.W. 87 (1933).

Appellee calls our attention to the *Lomax, supra*, and *Curtin, supra*, cases. As we have said, there are cases which can be used to support its position. Now, then, those two cases, although similar to the one at bar, are not "exactly identical."

We agree that it is very difficult to find two perfectly identical cases. In none of said two cases the following elements found in the case at bar are present: (1) that the agent called for collections in an irregular manner; (2) that the agent called for the last collection after the occurrence of the insured's death, the agent having full knowledge thereof; and (3) that the insured was not informed of the company's address to tender the payments in the event the agent did not call at his house for them. These three elements are sufficiently important in the general set of facts of the case at bar to justify a different decision.

In the case at bar the assured, having no knowledge of the address of defendant company, actually had only one means to tender the payment: payments tendered personally to the agent when the latter called at the insured's house. Especially when the agent, as the contract reads, had to credit the payments in the receipt book, which the insured kept, in order to bind the company. This situation shows that the intention of the parties was, and it is the custom besides, that the premiums be paid to the agent when the latter called at the insured's house to collect them. These being industrial policies, that was the general custom. The collection at the house of the policyholder is one of the typical characteristics of this kind of policy.[10]

In view of the foregoing, we conclude that the two policies were in force at the time of Virgilio Caraballo's death. There concur, in this case, the requirements established by a long line of decisions to render such judgment. The agent's practice of collecting overdue premiums at the house of the policyholder irregularly and unpredictably, created in the latter the reasonable expectancy that, although the weekly premiums were overdue, the agent would call to collect them. Our position is buttressed by the additional circumstance that

---

[10] See the works and pages cited in footnote No. 1.

the defendant company had not informed the insured the address where he could deliver or send the payments in the event the agent failed to call at his house to collect them.

As some courts have stated, if we should decide that the company may collect overdue premiums, but that it may also successfully refuse to pay the policies if at the death there are premiums in arrears, it would always be easy to collect premiums already due, and thereby free itself of the obligation of paying the policies when the insured died, as he must die sometime, since the insured would always die leaving overdue premiums. In other words, the lapsed policies could be collected as long as the insureds are alive, and in the event the agent calls at the house of the insured when the latter has already died, by not collecting the premium corresponding to said week, the company would remain free from its obligation to pay. Such a situation is untenable.

The judgment rendered in this case on September 25, 1964, by the Superior Court, San Juan Part, will be reversed and another rendered sustaining the complaint and ordering defendant to pay to plaintiff the amount of $6,000 for the policies, plus interest, $900 for attorney's fees, and the costs.