MONSERRATE ROSARIO, demandante y recurrente, *v.* ATLANTIC SOUTHERN INS. CO. OF PUERTO RICO, demandada y recurrida.

*Número:* R-65-13          *Resuelto:* 26 de febrero de 1968

760

*Raúl Torres González,* abogado de la recurrente; *Luis F. Sánchez Vilella,* abogado de la recurrida.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

El Juez Asociado Señor Rigau emitió la opinión del Tribunal.

Debemos determinar si estaban en vigor o no dos pólizas de vida a la muerte del asegurado. Se trata de un aspecto especializado de la contratación—el negocio de seguros—y los hechos particulares del caso son, como hemos de ver, determinantes del derecho aplicable.

En 13 de febrero de 1961 la Peninsular Life Insurance Company expidió dos pólizas a favor de Virgilio Caraballo, una de accidente, por la suma principal de $2,500 y otra dotal de $500, ambas con cláusula de doble indemnización en caso de muerte accidental. En ambas pólizas el asegurado designó beneficiaria a su esposa, Monserrate Rosario. Por ser dichas pólizas del tipo conocido como industrial, las primas se cobraron invariablemente a domicilio por el agente vendedor de la compañía aseguradora. Las pagaba el asegurado personalmente y algunas veces las pagaba su esposa. (1)

Luego de compradas las pólizas pero antes de morir el asegurado la compañía aquí demandada, Atlantic Southern Insurance Co., se hizo cargo de las mismas.

---

(1) Se conoce por seguro industrial un seguro de vida cuya suma principal es pequeña, cuyas primas se pagan a intervalos cortos—quincenal o semanalmente—y las cobra a domicilio un agente de la compañía aseguradora. Su nombre de industrial se debe a que se originaron como pólizas que se vendían—y se venden—a obreros, gente pobre que no podía afrontar pagos de primas en plazos trimestrales o mayores y que no tenían medios o la costumbre de hacer pagos mediante cheques o giros. Mehr & Osler, *Modern Life Insurance,* Revised ed. (1956) pág. 239; MacLean, *Life Insurance,* 8va. ed., pág. 374; Vance *On Insurance,* 3ra. ed., pág. 54; Keeton, *Basic Insurance Law* (1960) pág. 54; 1 Appleman, *Insurance Law and Practice* (1965), Sec. 7, pág. 21; 1 Richards, *Law of Insurance,* 5ta. ed. (1952), pág. 431; 1 Couch, *On Insurance* 2d, Sec. 1:60. Para una definición estatutaria véase 26 L.P.R.A. sec. 1502.

Al morir el asegurado, su esposa, la demandante, reclamó de la demandada el pago de las pólizas pero ésta se negó a hacerlo aduciendo como razón para ello que cuando el asegurado falleció las pólizas no estaban en vigor por haber vencido o caducado por falta de pago de las primas. El Tribunal Superior falló a favor de la demandada y decidimos revisar.

Tenemos que dilucidar los siguientes puntos: Cuál era, en lo aquí pertinente, la relación contractual entre asegurado y aseguradora; cuál fue la costumbre o práctica establecida por la aseguradora para el cobro de las primas; y qué efecto, si alguno, tuvo esa costumbre en cuanto a la relación contractual antes mencionada.

Las pólizas fueron expedidas por la Peninsular Life Insurance Co. Una, la llamada "Póliza Comprensiva de Accidente," contiene una cláusula sobre "Pago de Primas" que, en lo pertinente, lee así:

"Las primas son pagaderas solamente a un representante autorizado de la Compañía, y dichos pagos de primas, para obligar a la Compañía, deben ser propiamente creditados y registrados por dicho representante en el libro de recibos perteneciente a esta Póliza. Si por alguna razón la prima no es cobrada por la Compañía al vencerse; el tenedor de Póliza tendrá la obligación de llevar o enviar dicha prima a la Oficina Principal de la Compañia o a una de sus sucursales."

Sobre los términos del contrato la póliza tiene una cláusula que dispone:

"Esta Póliza, incluyendo los endosos y documentos adjuntos, si alguno, constituye el contrato completo de seguro. Ningún cambio en esta Póliza será válido hasta ser aprobado por un oficial ejecutivo de la Compañía y a menos que dicha aprobación sea endosada sobre o adherida a la presente. Ningún agente tiene autoridad para cambiar esta Póliza o para renunciar cualquiera de sus disposiciones."

La cláusula sobre pago de primas hace referencia al libro de recibos ("Premium Receipt Book"), en el cual, cuando se

hacen los pagos, el representante de la compañía deberá acreditarlos "para obligar a la Compañía." Ni la póliza ni el libro de recibos informan al asegurado de la dirección de la oficina de la compañía en Puerto Rico; sólo indican que la oficina central está en "Jacksonville, Florida" sin dar detalles de calle y número o de dirección postal.

La otra póliza, la dotal por $500.00, tiene unas cláusulas iguales a las antes transcritas de la primera. También da como única dirección "Jacksonville, Florida," sin más detalles de calle y número o apartado de correos. El libro de recibos es el mismo que se utilizaba para la primera póliza. Dicho libro lo retenía el asegurado y en él acreditaba el agente los pagos de las primas de ambas pólizas cuando las cobraba.

Al hacerse cargo la *Atlantic Southern* de esas pólizas que emitió originalmente la *Peninsular Life,* no se le suministró al asegurado la dirección de la nueva compañía; ni la dirección en los Estados Unidos ni en Puerto Rico.

Las pólizas se emitieron el 13 de febrero de 1961 y ese día se hizo el primer pago. Según el contrato escrito las primas se pagarían semanalmente; 40 centavos una y 83 centavos la otra. El libro de recibos añade que se pagarían cada lunes por adelantado. La prueba demuestra que la realidad fue otra. Las visitas del agente de la compañía para cobrar las primas no siguieron un plazo o patrón regular sino que el cobro se hizo en forma irregular e impredecible. Unas veces iba semanalmente, pero otras veces dejaba pasar dos, tres y cuatro semanas y en una ocasión más de cinco semanas antes de volver. Siempre cobraba las primas ya vencidas y algunas por adelantado. La última vez que fue a cobrar, muerto ya el asegurado, hacía 40 días que no iba. En esa ocasión el agente, sabiendo ya de la muerte del asegurado, cobró las 5 semanas vencidas más la que habría de vencer en la semana próxima. Ese último cobro lo hizo en 3 de diciembre de 1962 y el anterior lo había hecho en octubre 24

de ese año. El asegurado falleció en 29 de noviembre de 1962. En todo el año 1962 el agente sólo cobró dos veces dentro del plazo semanal como rezaba el contrato. La costumbre del agente fue, pues, ir a cobrar en forma irregular dejando pasar varias semanas, pero no el mismo número de semanas siempre, y de cobrar primas atrasadas.

Si cuando el asegurado fallece el pago de las primas está al día, el riesgo está cubierto, desde luego, y no debe surgir problema alguno de esta clase que requiera intervención judicial. Tampoco surge, aunque la prima esté vencida y no pagada, si la muerte ocurre dentro de un período de cuatro semanas después de vencida porque durante este período, llamado de gracia, la póliza está en pleno vigor por mandato expreso de ley. 26 L.P.R.A. sec. 1505. Es, sin embargo, más probable que planteen dudas y que requieran examen y determinación judicial las situaciones en que el asegurado muere después de expirado el período de gracia dejando primas insolutas. Una situación semejante es la del caso de autos.

Teniendo en mente el cuadro de hechos que hemos visto examinemos el derecho existente sobre esta materia en busca de la solución al problema planteado, o sea, si las pólizas estaban vigentes o no a la muerte del asegurado.

■ · Si bien es cierto que los contratos obligan a las partes que los otorgan y que su cumplimiento no puede dejarse al arbitrio de una de las partes, [2] las materias especiales se rigen por sus leyes especiales y por el derecho jurisprudencial que se va formando en torno a los estatutos. El Código Civil, desde luego, como espina dorsal que es de nuestro derecho privado, queda siempre como acervo supletorio. [3] En esta materia de seguros hay legislación espe-

---

[2] Código Civil, Arts. 1208 y 1209; 31 L.P.R.A. secs. 3373 y 3374.
[3] Código Civil, Art. 12.

cial([4]) y hay una larga experiencia que ha producido abundante derecho decisorio. Las dos cláusulas de las pólizas anteriormente transcritas, relativa una al pago de primas y dispositiva la otra de que el agente no puede variar los términos del contrato ni renunciar derechos de la compañía, son cláusulas standard y aparecen literalmente en cientos de miles de contratos de esta naturaleza. ([5]) Por ser tan numerosos estos contratos y de antiguo origen, es de esperarse que estas cláusulas que nos ocupan hayan sido objeto de interpretación judicial muchas veces. Así es en efecto.

Aunque hay casos en contrario([6]) la mayoría de los casos y de los tribunales que han resuelto situaciones como la de autos en favor de la posición de la demandante es abrumadora. ([7]) Antes de examinar la jurisprudencia existente sobre situaciones iguales a la de autos veamos primero los principios generales que la jurisprudencia y los tratadistas han sentado sobre esta materia.

■ Los contratos de seguro, por ser contratos de adhesión, se interpretan liberalmente a favor del asegurado. *Barreras* v. *Santana*, 87 D.P.R. 227, 231–235 (1963); *Aparicio* v. *Asoc. de Maestros*, 73 D.P.R. 596, 602 (1952); *Mutual Life Ins. Co.* v. *Hurni*, 263 U.S. 167, 174 (1923); Vance, *On Insurance*, 3ra. ed., pág. 243; 3 Richards, *On Insurance*, 5ta. ed., pág. 1314.

---

([4]) Véase el Código de Seguros de Puerto Rico, 26 L.P.R.A. secs. 101 y ss.

([5]) En el año 1966 en los Estados Unidos había pólizas industriales vendidas por un valor total de $40 billones. *Life Insurance Fact Book* (1967), pág. 19.

([6]) *Home Beneficial Assn.* v. *Lomax*, 4 F.2d 292 (1925); *Curtin* v. *John Hancock Mut. Life*, 167 N.Y.Supp. 1041 (1917).

([7]) Véanse las páginas de anotaciones, ordenadas por estados, en orden alfabético, en 15 Appleman, *Insurance Law and Practice*, bajo las secciones 8551 (Extension of Time for Payment); 8553 (Particular Conduct Establishing Custom); 8556 (Conduct of Agents); 8558 (Custom as to Method of Payment); 8560 (Collection of Premiums by Insurer) y 8562 (Payments after Loss).

■ Los tribunales no favorecen la caducidad de los contratos de seguro. *Von Uhl* v. *Trempealeau County Mut. Ins. Co.*, 146 N.W. 516, 520 (1966); *Larson* v. *Union Central Life Ins. Co.*, 137 N.W.2d 327 (1965); *Efinger* v. *Order of United Commercial Travelers*, 156 So.2d 38 (1963); *Siebert* v. *Supreme Council of Order of Chosen Friends*, 23 Mo. App. 268 (1886).

Tampoco favorecen la caducidad por falta de pago de primas. *Life & Casualty Ins. Co.* v. *Eubanks*, 94 So. 198, 199; *Manhattan Life Ins. Co.* v. *Parker*, 85 So. 298; *Mutual Life Ins. Co.* v. *Lovejoy*, 78 So. 299.

■ Las doctrinas de renuncia (*waiver*) e impedimento (*estoppel*), las cuales son de aplicación en todo el derecho, son de especial aplicación en el campo de los seguros debido a la naturaleza de adhesión de esos contratos. Vance, obra citada, pág. 471 y autoridades allí citadas.

■ Las condiciones en las pólizas relativas a la caducidad y suspensión de éstas pueden ser renunciadas por las aseguradoras y los actos de las aseguradoras y de sus agentes pueden constituir dicha renuncia. A veces esos actos constituyen impedimento para levantar esas condiciones contra el asegurado. *Wiles* v. *Nationwide Life Ins. Co.*, 334 F.2d 296, 300 (1964); *Lafargue* v. *United Royal Life Ins. Co.*, 169 So.2d 240, 242 (1964); *Herbert* v. *Woodruff's Ins. Co.*, 19 So.2d 290. Para dos páginas a dos columnas de casos sobre el particular véase 6 Couch, *On Insurance* 2d, págs. 496–497.

■ Cuando la aseguradora o sus agentes establecen una costumbre sobre pago de primas distinta a lo que expresa el contrato escrito no puede luego la aseguradora valerse de la letra estricta del contrato en contra del asegurado, aun cuando el contrato diga que los agentes no están autorizados para variar los términos del contrato. Sobre esto pueden

mencionarse tantos casos que sería prolijo hacerlo, [8] además en breve vamos a considerar casos específicos iguales al de autos.

■ Se ha resuelto que la costumbre del agente de cobrar primas vencidas constituye una renuncia de la cláusula de caducidad por falta de pago, aun si se paga luego de expirado el período de gracia y aunque la póliza diga lo contrario, *Lafargue* v. *United Royal Life Ins. Co.*, supra; *Inter-Ocean Insurance Co.* v. *Banks*, 104 So.2d 836, 838 (1958); *Friedland* v. *American Bankers Ins. Co.*, 52 P.2d 660; 6 Couch, *On Insurance* 2d, págs. 566 y 636; 15 Appleman, *Insurance Law & Practice*, Secs. 8551, 8553, 8560.

■ Se ha resuelto repetidas veces que cuando el agente establece la costumbre de cobrar las primas a domicilio el asegurado está justificado en descansar en esa costumbre y en no hacer los pagos en otra forma, a menos que se le notifique previamente de la intención del agente de abandonar dicha costumbre, pues dicha costumbre o práctica crea en el asegurado una expectación razonable de que se seguirá observando la misma. [9]

Como se recordará, en el caso de autos las primas no se cobraron semanalmente por adelantado como disponían los contratos sino que se cobraron en plazos irregulares y muchas veces ya vencidas. También existe en este caso la circunstancia adicional que la demandada no informó al asegurado de a qué dirección podía o debía enviar los pagos en caso de que el agente no fuese a cobrar regularmente. Veamos cómo los tribunales han resuelto situaciones iguales a ésta.

---

[8] Véase la anotación de tres páginas a dos columnas en 6 Couch, *On Insurance* 2d, págs. 591–593, bajo la sección "Effect of custom and usage."

[9] Véanse los materiales citados en el escolio anterior; los casos que siguen en esta opinión; y 6 Couch, *On Insurance* 2d, pág. 611.

En *Lafargue* v. *United Royal Life Ins. Co.*, 169 So.2d 240 (1964) al tiempo del fallecimiento de la persona asegurada había seis primas semanales insolutas. La póliza disponía para un período de gracia de cuatro semanas y de acuerdo con los términos literales del contrato la póliza había caducado. Sin embargo, como el agente de la compañía había establecido la costumbre o práctica de cobrar primas vencidas, el tribunal concluyó que los actos del agente equivalían a una renuncia de la compañía del período de caducidad dispuesto en la póliza y ordenó que se pagase el importe de la misma. Allí se citó con aprobación el caso de *Herbert* v. *Woodruff's Ins. Co.*, 19 So.2d 290, resuelto en igual forma aun cuando en ese caso la póliza disponía expresamente que los agentes no podían variar los términos del contrato y que la aceptación de pólizas vencidas era meramente una cortesía de parte de la aseguradora.

Otro caso igual al de autos es el de *Life & Casualty Ins. Co.* v. *Eubanks*, 94 So. 198 (1922). En dicho caso, al igual que en el caso de autos, era costumbre de la compañía enviar un cobrador para cobrar las primas; el cobrador se presentaba en la residencia del asegurado aproximadamente cada dos semanas; el accidente ocurrió estando vencidas las primas de las dos semanas anteriores; el cobrador se presentó después del accidente e hizo el cobro de las primas vencidas con conocimiento de que el asegurado había sufrido un accidente y entregó a la esposa de éste los papeles para hacer la reclamación.

En dicho caso de *Eubanks* el contrato tenía las siguientes condiciones: La prima semanal de 40 centavos se cobraría todos los lunes por adelantado; si las primas de dos semanas estaban insolutas, el pago posterior sólo cubriría accidentes que ocurrieran después de pago; si el cobrador no se presentaba a cobrar era obligación del asegurado enviar el pago a la oficina de la compañía; y ningún cobrador o agente estaba autorizado para renunciar al derecho de cancelar la póliza

por caducidad. Nótese la gran semejanza entre ese caso y el de autos.

■ A pesar de lo anterior el tribunal ordenó que se pagase la póliza. Expresó que como el agente había establecido la costumbre de cobrar primas vencidas eso constituía una renuncia de la aseguradora de levantar la cuestión de la caducidad de la póliza por falta de pago. Dijo que la compañía tenía el derecho de no aceptar primas vencidas y levantar la cuestión de la caducidad, pero que al aceptar los pagos vencidos había renunciado ese derecho. En *Wiles* v. *Nationwide Life Ins. Co.*, 334 F.2d 296, 302 (1964), se dijo que la caducidad no es automática pues las circunstancias pueden demostrar que se ha renunciado a ella.

En *Carey* v. *John Hancock Mut. Life Ins. Co.*, 100 N.Y. Supp. 289 (1906), la póliza no especificaba el lugar de pago, pero era costumbre de la compañía enviar semanalmente un cobrador a la casa del asegurado. El cobrador dejó de ir y el asegurado murió tres meses después de caducar la póliza. El tribunal entendió que la costumbre antes mencionada justificaba concluir que la póliza no había caducado y que en todo caso era suficiente para impedir al asegurador presentar la defensa de caducidad.

En *Banker's Health & Life Ins. Co.* v. *Givvins*, 77 S.E. 203 (1913), el tribunal, después de observar que hubo ocasiones en que la compañía había aceptado pagos vencidos, expresó que tal conducta permitía concluir que si el asegurado no hubiese muerto la compañía también hubiese aceptado los pagos vencidos a la fecha de su muerte. Expresó que al aceptar pagos atrasados la compañía indujo al asegurado a creer que era permisible hacer pagos atrasados y añadió que sería injusto en esas circunstancias declarar la póliza vencida e inoperante porque hubiese primas insolutas a la muerte del asegurado. Igual razonamiento se expresó en *Adams* v. *Washington Fidelity Nat. Ins. Co.*, 173 S.E. 247 (1934).

En *Baker* v. *Michigan Mut. Protective Ass'n*, 76 N.W. 970 (1898), el agente le informó al asegurado que enviaría un cobrador a su casa durante los primeros diez días de cada mes. En una ocasión el cobrador no fue y el asegurado murió el día 14 del mes. El tribunal ordenó que se pagase la póliza y expresó que sería injusto que la compañía se beneficiase de su propio incumplimiento y señaló como significativo que los pagos se hacían en la residencia del asegurado y que éste no conocía la dirección de la compañía para hacer el pago en otra forma.

No creemos útil continuar la discusión en detalle de casos que repiten y aplican los principios antes enunciados en el curso de esta opinión. En *Mayer* v. *The Mutual Life Ins. Co. of Chicago*, 18 Am. Rep. 34, se utilizó el razonamiento de la expectación razonable que ya antes hemos discutido. En *Vinginerra* v. *Commercial Casualty Ins. Co.*, 156 N.Y.Supp. 573, se siguió lo dicho en *Carey*, supra. Además véanse *Rumbeck* v. *Farmers' & Bankers' Life Ins. Co.*, 150 Pac. 586 y *Cochran* v. *National Casualty Co.*, 246 N.W. 87 (1933).

La recurrida trae a nuestra atención los casos de *Lomax*, supra, y *Curtin*, supra. Como ya dijimos, hay casos que pueden utilizarse para fundamentar su posición. Ahora bien, esos dos casos, aunque parecidos al de autos, no son "exactamente iguales." Concedemos que es muy difícil encontrar dos casos exactamente iguales. En ninguno de dichos dos casos están presentes los siguientes elementos que se encuentran en el de autos: (1) que el agente hacía los cobros en forma irregular; (2) que el último cobro se hizo después de haber ocurrido la muerte del asegurado estando el agente enterado de ello; y (3) que el asegurado no fue informado de una dirección adonde enviar los pagos si el agente no iba a cobrarlos. Estos tres elementos tienen suficiente importancia en el cuadro general de hechos del caso de autos como para justificar una solución distinta.

En el caso de autos, al no saber el asegurado la dirección de la compañía demandada, realmente sólo se le dejó una forma de hacer los pagos: el pago hecho personalmente al agente en el domicilio del asegurado. Máxime cuando el agente tenía, según reza el contrato, que acreditar los pagos en el libro de recibos, que guardaba el asegurado, para que éstos obligasen a la compañía. Esa situación demuestra que la intención de las partes era, y es la costumbre además, que las primas se pagasen al agente cuando éste fuese a cobrarlas a casa del asegurado. Tratándose de pólizas industriales esa costumbre es universal. El cobro a domicilio es una de las características típicas de esa clase de pólizas. [10]

En vista de todo lo anterior concluimos que las dos pólizas estaban en vigor al fallecimiento de Virgilio Caraballo. Concurren en este caso los requisitos que establece una larga y abundante jurisprudencia para fallar en este sentido. La costumbre del agente de cobrar a domicilio primas vencidas, en períodos irregulares e impredecibles, creó en el asegurado la razonable expectación de que aunque las primas semanales estuviesen vencidas el agente vendría a cobrarlas. Refuerza nuestra posición la circunstancia adicional de que la compañía demandada no había informado al asegurado a qué dirección podía llevar o enviar los pagos en caso de que el agente no fuese a cobrarlos.

Como algunos tribunales han señalado, si resolviésemos que la compañía puede cobrar las primas después de vencidas pero que también puede negarse con éxito a pagar las pólizas si al ocurrir el fallecimiento hay primas insolutas, sería fácil cobrar siempre las primas luego de vencidas y de ese modo librarse de la obligación de pagar las pólizas cuando el asegurado muriese, como ha de morir en alguna ocasión, pues los asegurados siempre morirían dejando primas insolutas. En otras palabras, se podrían cobrar las pólizas ven-

---

[10] Véanse las obras y páginas citadas en el escolio Núm. 1.

cidas siempre que los asegurados estén vivos y si al llegar el agente a casa del asegurado éste ha fallecido, con no cobrar esa semana quedaría la compañía libre de su obligación de pagar. Tal situación es insostenible.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en este caso en 25 de septiembre de 1964 y se dictará una declarando con lugar la demanda y ordenando a la demandada a pagar a la demandante la suma de $6,000.00 por concepto de las pólizas, más los intereses, $900.00 de honorarios de abogado y las costas.*