*705 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos Integrand Assurance Company (Integrand o la apelante) en el recurso de apelación de epígrafe. Nos solicita que revoquemos la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (el TPI), el 9 de septiembre de 2005 y notificada el 12 de igual mes y año. Por medio de ésta, el TPI declaró ha lugar la demanda sobre sentencia declaratoria incoada por el Sr. Félix Abaunza Santiago (el Sr. Abaunza), la Sra. Antonia Torres De León (la Sra. Torres) y la sociedad de bienes gananciales compuesta por ambos (en conjunto los apelados) para que Integrand reconociera la vigencia del contrato de seguros suscrito por las partes y les resarciera los daños sufridos por su negocio Restaurant El Cielito. En consecuencia, el TPI ordenó a la apelada que le pagara a los apelados $129,510 por concepto de los daños estructurales sufridos en el Restaurant El Cielito, $30,000 por el mobiliario y otros muebles del negocio y $10,000 por los daños recibidos por la interrupción del negocio. Además, les concedió la suma de $50,000 por sus angustias mentales.
Examinados los escritos de las partes, los documentos obrantes en los autos originales y el derecho aplicable, resolvemos confirmar la sentencia apelada.
I
El 24 de mayo de 1999, los apelados presentaron ante el TPI una demanda sobre sentencia declaratoria en contra de Integrand, Progressive Finance and Investment Corporation (Progressive) y Seguros Alvaro Calderón (Seguros Calderón). En ella, alegaron que el 13 de julio de 1998 renovaron el contrato de seguros por la póliza CP7006987 que mantenían con la apelante, el cual tendría vigencia hasta el 30 de junio de 1999, y que el total de la prima ascendió a $4,110.00, de los cuales los apelantes pagaron $828.00 y Progressive les financió $3,282.00 a través de un contrato de ventas al por menor a plazos, con pagos mensuales de $362.00.
Adujeron que el 18 de agosto de 1998, Seguros Calderón emitió, a instancias de Progressive, un aviso de cancelación de póliza por falta de pago a ser efectivo el 28 de agosto de igual año; que el 18 de septiembre de 1998 el Sr. Abauza giró el cheque número 1066 por las mensualidades atrasadas ($762.26) a favor de Progressive y que su corredor de seguros, el Sr. Edgardo Morales (el Sr. Morales), lo entregó personalmente a dicha entidad financiera.
Señalaron además que posteriormente, el 18 de septiembre de 1998, Integrand impartió instrucciones a Seguros Calderón para que no aceptara negocios nuevos ni reinstalaciones de póliza debido a la inminencia del paso del huracán Georges por Puerto Rico. Asimismo, argüyeron que el 21 de septiembre de 1998 ese huracán les ocasionó considerables daños a su negocio Restaurant El Cielito. Explicaron que luego de que un ajustador de Integrand evaluara las daños del mencionado negocio y les informara que los mismos habían sido estimados en $124,000.00, Integrand se negó a concederles la cubierta de su póliza de seguros para resarcir los daños causados a su negocio al aducir que el contrato suscrito por las partes había sido cancelado por falta de pago de primas a Progressive y que no había sido reinstalado al paso del huracán.
*706 Así las cosas, los apelados sostuvieron ante el TPI que habían realizados los correspondientes pagos de prima antes de que Integrand emitiera el aviso de que no se aceptarían negocios nuevos o endosos a pólizas. En consecuencia, solicitaron a dicho tribunal que reconociera la vigencia del mencionado contrato de seguros y que, conforme a ello, ordenara a Integrand el pago de los daños reclamados.
Por su parte, Integrand presentó su Contestación a la Demanda el 11 de octubre de 1999. A través de la misma, argüyó esencialmente que el contrato de seguros suscrito por las partes no estaba vigente a la fecha del paso del huracán Georges ya que el alegado pago de $762.26 que los apelados hicieron a favor de Progressive por concepto de las mensualidades atrasadas se dio después de que Integrand cesara de dar cubierta de seguros debido al aviso de alerta emitido por el Negociado del Tiempo federal ante el paso del mencionado huracán.
Posteriormente, el 21, 22 y 23 de septiembre de 2004, el TPI llevó a cabo el juicio en su fondo. En éste, los apelados presentaron sus propios testimonios así como los testimonios de su corredor de seguros el Sr. Morales, el Sr. Luis R. Calderón Mongil (el Sr. Calderón), quien es el presidente de Seguros Calderón y la Sra. Catherine Garland González (la Sra. Garland), quien era la Gerente de Progressive cuando los apelados alegadamente entregaron su pago a ésta. Por su parte, Integrand presentó los testimonios de su presidente, el Sr. Víctor Salgado Micheo (el Sr. Salgado), la Sra. Arlene Rivera Vargas (la Sra. Rivera) y el Sr. Andrés Rodríguez Bergollo (el Sr. Rodríguez), quienes respectivamente fungían como Gerente del Departamento de Suscripción y Vicepresidente de Suscripción de Integrand a la fecha de la reclamación de los apelados.
Luego de desestimar la demanda en contra de Seguros Calderón y emitir una sentencia parcial por desistimiento a favor de Progressive, el 9 de septiembre de 2005, el TPI emitió la sentencia apelada. En ella, resolvió lo siguiente:

"Luego de un análisis de los hechos probados ante este Tribunal y estudiada la doctrina de aplicación, no nos queda más que colegir que la póliza de seguro CP7006987 se encontraba en vigor al momento de ocurridos los daños que afectaran el Restaurante El Cielito, propiedad de la parte demandante. Surge de los hechos ante nos que en más de una ocasión la aseguradora demandada Integrand aceptó pagos de primas vencidas y procedió a reinstalar la póliza en cuestión. Este proceder creó en los demandantes la genuina creencia de que a[u]n cuando las primas estuvieran vencidas, la aseguradora aceptaría el pago de las mismas procediendo así con su reinstalación. El hecho de que la póliza se encontrara ‘técnicamente’ cancelada por falta de pago no es razón que nos mueva a concluir que la póliza se encontrara vencida a la fecha en que ocurrieran los daños. Ciertamente, los actos de la agencia de seguros, de la financiera de primas y en especial de la aseguradora Integrand constituyen una renuncia a su derecho de levantar como defensa la caducidad de la póliza de seguro por falta de pago. [...]

En el caso de autos, los demandantes realizaron el pago 20 días después de hacerse efectivo el aviso de cancelación de póliza. Surge de los hechos que el pago fue recibido por la financiera en la mañana del 18 de septiembre del año 1998, horas antes de que se recibiera la instrucción por parte de la aseguradora a los efectos de que no se suscribieran ni reinstalaran más pólizas en vista de la proximidad del azote del huracán, una vez presentada la reclamación de los demandantes a la asegurados [sic] por los daños sufridos en la propiedad asegurada, un ajustador y un ingeniero estructural de la demandada Integrand visitaron la propiedad afectada con el propósito de estimar el valor de los daños sufridos. No es hasta después de realizada esta labor que la aseguradora envía la comunicación a los efectos de que la póliza se encontraba cancelada. De no haber ocurrido los referidos hechos, no albergamos duda alguna en cuanto a que la aseguradora demandada Integrand habría reinstalado la póliza de seguro sin mayores objeciones. [...].

Es por los fundamentos que anteceden, tanto de hechos como de Derecho, que declaramos Ha Lugar la demanda presentada por Félix Abaunza Santiago, Antonia Torres de León y la Sociedad Legal de Gananciales por ellos compuesta. ” (Énfasis nuestro).
*707 Inconforme, el 18 de octubre de 2005, Integrand presentó el recurso de epígrafe. Nos señaló los siguientes errores:

“Erró el tribunal de instancia al apreciar la prueba y determinar que la compareciente est[á] impedida y/o renunció a oponer la caducidad de la póliza por falta de pago.

Erró el tribunal de instancia al apreciar la prueba y determinar que el contrato de seguros estaba vigente a la fecha del suceso por el que reclaman los demandantes, y por ende, estimar que la compareciente debía ofrecer cubierta a los demandantes

Erró el tribunal de instancia al considerar que el cumplimiento de los términos de un contrato de seguro puede quedar al arbitrio exclusivo de uno de los contratantes.

Erró el tribunal de instancia en la valoración de los daños alegados por los demandantes, concediendo una indemnización excesiva. ”

Por su parte, los apelantes presentaron su alegato de oposición el 20 de enero de 2006. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.
II
El Art. 1.020 del Código de Seguros de Puerto Rico, 26 L.P.R.A. see. 102, define el contrato de seguros como aquél mediante el cual una persona se obliga a indemnizar a otra o a pagarle o proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo. Ahora bien, al analizar el contrato de seguros debemos tener presente que, tal y como señaló nuestro Tribunal Supremo en Cervecería Corona v. Commonwealth Ins. Co., 115 D.P.R. 345 (1984), el mismo no es uno ajeno a las normas básicas del derecho de obligaciones. A pesar de estar regulado por las normas establecidas en el Código de Seguros, este contrato está sujeto también a las disposiciones del Código Civil.
Asimismo, es necesario que en el contrato de seguros estén presentes los elementos de objeto, causa y consentimiento para que tome vida jurídica la relación contractual. Una vez constituido, el contrato se convierte en la ley entre las partes. Código Civil, Arts. 1213 y 1230, 31 L.P.R.A. secs. 3391, 3451. En el contrato de seguros, la causa del asegurador es la prima que recibe del asegurado. El pago de la prima es un elemento esencial del contrato, pues, de otro modo, el contrato sería uno sin causa y, por tanto, inefectivo. Código Civil, Arts. 1226 y 1227, 31 L.P.R.A. secs. 3431, 3432. Por ende, “[l]os aseguradores, mediante este contrato, asumen la carga económica de los riesgos transferidos a cambio de una prima. El contrato de seguros, es pues, un contrato voluntario mediante el cual, a cambio de una prima, el asegurador asume unos riesgos. La asunción de riesgos es, por lo tanto, uno de los elementos principales de este contrato. [...] [E]n el contrato de seguros se transfiere el riesgo a la aseguradora a cambio de una prima y surge una obligación por parte de ésta de responder por los daños económicos que sufra el asegurado en caso de ocurrir el evento específico ”. Id., a la pág. 605; Véase, Aseg. Lloyd’s London v. Cía. Des. Comercial, 126 D.P.R. 251, 266-267 (1990).
La prima tiene, además, otro papel vital dentro del contrato de seguros. "En el seguro, el ingreso por concepto de primas es el único fondo del cual se pagan las pérdidas. Dicho ingreso debe ser suficiente para satisfacer las pérdidas resultantes de riesgos de naturaleza similar." Caribe Lumber v. Inter-Am. Builders, 101 D.P.R. 458 (1973). Siendo así, no es de extrañar que el propio Código de Seguros reconozca la facultad del asegurador de cancelar un seguro, ya fuere por falta de pago de la prima, o por aquellos fundamentos que se especifiquen en la póliza. Código de Seguros, Art. 11.270, 26 L.P.R.A. sec. 1127. De igual forma, la reinstalación de la póliza está sujeta al pago de la prima. Código de Seguros, Art. 13.100, 26 L.P.R.A. see. 1310. El pago de la prima constituye, en resumen, una condición esencial sin la cual no puede existir el contrato de seguro.
*708 De otro lado, en Quiñones López v. Manzano Pozas, 127 D.P.R. 747, 760 (1991), nuestro Tribunal Supremo expresó que "[...] cuando los términos, condiciones y exclusiones de un contrato de seguros que es ley entre las partes son claros, específicos y no dan margen a ambigüedades o diferentes interpretaciones, debe hacerse valer los mismos de conformidad con la voluntad de las partes. En ausencia de ambigüedad, las cláusulas del contrato son obligatorias para las partes."
Un contrato de seguros es un típico contrato de adhesión que debe interpretarse liberalmente a favor del asegurado. Si las cláusulas son claras, las mismas son obligatorias para el asegurado. García Curbelo v. A.F.F., supra. No obstante, el Tribunal Supremo aclaró que aunque este tipo de contrato generalmente se interpreta a favor del asegurado, ello no tiene el efecto de obligar a que siempre sea de esa manera. Se favorecerá al asegurador cuando cláusulas claras y sin ambigüedad le den la razón. González Burgos v. Cooperativa de Seguros de Vida de Puerto Rico, 117 D.P.R. 659 (1986). Así pues, las dudas serán resueltas de modo que se cumpla con el propósito de la póliza. Se buscará el sentido o significado que a las palabras de la póliza le daría una persona normal de inteligencia promedio. Barreras v. Santana, 87 D.P.R. 227 (1963).
Finalmente, el Artículo 1054 del Código Civil sujeta a aquellos que de alguna manera contravengan sus obligaciones, a la indemnización de los daños y perjuicios causados. El aludido artículo dispone lo siguiente:
“Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas. ” 31 L.P.R.A. § 3018.
Según el catedrático Carlos J. Irizarry Yunqué, la acción que se deriva de un contrato protege las obligaciones convenidas por las partes al perfeccionarse el contrato, mientras que la acción extracontractual nace en el momento en que se produce un daño, sin que exista previa relación entre las partes. Ambas acciones persiguen un fin reparador, pero el concepto de daño en el caso de las acciones contractuales es más limitado. C. Irizarry Yunqué, Responsabilidad Civil Extracontractual, 4ta ed., San Juan, [s. Ed.], 2000, pág. 20.
Por su parte, el tratadista José Puig Brutau entiende que para que el deudor no incurra en responsabilidad por incumplimiento, debe observar una conducta destinada a satisfacer el interés del acreedor que corresponda o pueda calificarse como la diligencia del buen padre de familia. Para ello es preciso tener en cuenta lo que exige la naturaleza de la obligación para su cumplimiento, así como las circunstancias de las personas, el tiempo y el lugar, excepto cuando las mismas partes o la ley señalaren una diligencia superior o inferior, José Puig Brutau, Fundamentos de Derecho Civil, Tomo I, Volumen II, página 436.
De otra parte, en las acciones contractuales, la indemnización está limitada a aquellos daños que razonablemente pudieron contemplarse al otorgarse el contrato. Irizarry Yunqué, op.cit., pág. 24. Por regla general, nuestro ordenamiento jurídico no contempla la concesión de un remedio por daños morales como parte de una acción contractual. No obstante, nuestro más Alto Foro ha reconocido los mismos si “tales daños eran previsibles al contraer la obligación, son claramente consecuencia necesaria de la falta de cumplimiento, y sin han afectado en forma apreciable el estado emocional del reclamante”. Irizarry Yunqué, op. cit., pág. 25; Camacho v. Iglesia Católica, 72 D.P.R. 353 (1951); Pereira v. I.B.E.C., 95 D.P.R. 28 (1967).
Por otro lado, el derecho a ser compensado no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de los daños. Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695 (1999); S.L.G. v. F.W. Woolworth & Co., 143 D.P.R. 76 (1997). No obstante, al medir los daños en un caso, el juzgador debe hacerlo sobre una estricta base de correspondencia con la prueba, procurando siempre que la indemnización no se convierta en una industria y que no lesione la economía. Este deber de los jueces tiene el propósito de conservar el sentido remediador y no punitivo de nuestra responsabilidad civil. Rivera v. Tiendas Pitusa, Inc., supra ; S.L.G. v. F.W. Woolworth & Co.,supra. Por ejemplo, los sufrimientos mentales y físicos *709 son cuantificables al infinito, por lo que sin unos límites razonables, la indemnización dejaría de tener la característica de resarcimiento para convertirse en una punitiva. Riley v. Rodríguez de Pacheco, 119 D.P.R. 762 (1987).
La gestión de estimación y valorización de los daños descansa en la sana discreción del juzgador. Este está, en principio, en una mejor posición para apreciar y determinar los daños sufridos. Ello es así, en-cuanto es éste el que tiene contacto directo con la prueba que a esos efectos presenta la parte que los reclama. Bids v. Hosp. Guadalupe, supra; Rodríguez Cancel v. A.E.E, supra.
De ahí surge una norma de abstención judicial. Conforme a ésta, un foro apelativo no interviene, de ordinario, con la adjudicación de los daños realizada por el Tribunal de Primera Instancia, a menos que la cuantía concedida resultase ridiculamente baja o exageradamente alta. Bids v. Hospital Guadalupe, supra. En todo caso, la parte que solicita la modificación de las sumas concedidas, viene obligada a demostrar la existencia de circunstancias que lo justifiquen. Nieves Cruz v. U.P.R., supra; Rivera v. Tiendas Pitusa, Inc., supra; Blás v. Hosp. Guadalupe, supra. Ahora bien, ello no implica una renuncia de nuestra función revisora cuando la compensación ordenada está desprovista de apoyo en el récord. Véase, Sanabria v. E.L.A., 132 D.P.R. 769 (1993); Riley v. Rodríguez de Pacheco, supra; Urrutia v. A.A.A., 103 D.P.R. 643, 648 (1975).
La partida de sufrimientos y angustias mentales tiene la finalidad de indemnizar el dolor, los sufrimientos físicos y las angustias mentales que padece una persona como consecuencia del acto culposo o negligente. Elba A.B.M. v. U.P.R., 125 D.P.R. 294 (1990); Acosta & Rodas, Inc. v. PRAICO, 112 D.P.R. 583 (1982); Ramos Rivera v. E.L.A., 90 D.P.R. 828 (1964). Este dolor o sufrimiento mental por su naturaleza es uno difícil de valorar o cotizar. En vista de que cada ser humano goza de elementos físicos y mentales distintos y valores distinguibles, nuestro ordenamiento exige que todo reclamante, en cada caso, aporte factores de evidencia necesarios para evaluarlos justa y adecuadamente, probando que no se trata de una simple pena pasajera, sino que, en alguna manera apreciable, el reclamante realmente quedó afectado en su salud, bienestar y felicidad. Moa v. E.L.A., 100 D.P.R. 573 (1972).
III
Los tres primeros errores señalados requieren que resolvamos si el TPI actuó correctamente al determinar que Integrand estaba impedida por las doctrinas de renuncia (waiver) e impedimento (estoppel) de negar su cubierta de póliza a los apelados.
Con relación a dichas doctrinas, en López Castro v. Atlantic Southern Insurance Company, 158 D.P.R. _ (2003), 2003 J.T.S. 14, el Tribunal Supremo reconoció que las mismas “son de especial aplicación en el campo de los seguros debido a la naturaleza de adhesión de estos contratos”. Además, nuestro más Alto Foro expresó lo siguiente:
“La doctrina de renuncia [waiver] envuelve la intención por parte de la aseguradora de abandonar un derecho, como sería el de invocar la suspensión o caducidad del contrato de seguro por el incumplimiento de una de sus disposiciones. Por su parte, la doctrina de impedimento [estoppel] conlleva la abolición de derechos y privilegios de la aseguradora cuando fuera contrario a la equidad permitir su afirmación. [...]. Esta doctrina requiere demostrar que una de las partes en la transacción ha confiado en la apariencia creada por la otra y que resultaría en detrimento para la primera permitir que la segunda renuncie a los efectos de la apariencia creada. [...]..[...] Así, las condiciones relativas a la caducidad y suspensión de las pólizas pueden ser entendidas renunciadas por las aseguradoras en virtud de estas doctrinas, a través de sus actos o los de sus agentes. Esto impide que posteriormente las aseguradoras puedan levantar dichas condiciones contra el asegurado.” [Citas omitidas] (Énfasis nuestro). López Castro v. Atlantic Southern Insurance Company, supra.
*710 Al tenor de lo establecido por la jurisprudencia en cuanto a las mencionadas doctrinas, para resolver la controversia ante nos es necesario que esbocemos los hechos utilizados por el TPI para sostener que los actos de Seguros Calderón, como agente autorizado de Integrand, constituyeron una renuncia a cancelar la póliza de los apelados por falta de pago.
Surge del testimonio del Sr. Calderón que el Sr. Abaunza recibió tres Avisos de Cancelación por falta de pago de primas a Progressive. El primer aviso fue emitido el 19 de mayo de 1997 con efectividad el 29 de mayo de igual año. Este aviso tuvo como efecto una reinstalación automática de la póliza de los apelados. Ello porque el Sr. Abaunza realizó el pago dentro del período de gracia, es decir, dentro de los diez días posteriores a la emisión de ese aviso.
El segundo Aviso de Cancelación fue emitido el 18 de noviembre de 1997 con efectividad el 28 de noviembre de 1997. Ante tal situación, el Sr. Abaunza satisfizo el pago de la prima adeudada tres días después del período de gracia. En consecuencia, el Sr. Calderón le reinstaló la póliza de manera limitada a los apelados.
Por último, el tercer Aviso de Cancelación fue emitido el 18 de agosto de 1998 con efectividad el 28 de agosto de 1998. En esa ocasión, el Sr. Abaunza pagó las primas adeudadas veinte días después de transcurrido el período de gracia, es decir, el 18 de septiembre de 1998. Por su parte, el Sr. Calderón no reinstaló la mencionada póliza y envió el caso a Integrand para que ésta fuera quien tomara la decisión al respecto.
El 24 de septiembre de 1998, el ajustador de Integrand, el Sr. McTeddy Montañez (el Sr. Montañez), acudió al negocio de los apelados para evaluar los daños sufridos por éste. Posteriormente, el Sr. Montañez regresó al negocio acompañado por un ingeniero, quien estimó los daños sufridos en $129, 510.00. 
Así las cosas, el 21 de octubre de 1998, la Sra. Rivera le notificó a Seguros Calderón que la póliza de los apelados no podría ser reinstalada debido a que, al momento del pago de éstos a Progressive, Integrand había cerrado el mercado por el inminente paso del huracán Georges. Por tal razón, el 29 de octubre de 1998, el Sr. Calderón le envió a Integrand una carta suscrita por el padre del Sr. Morales en la cual especificó que, al momento en que el Sr. Morales entregó el pago de los apelados a Progressive, Seguros Calderón no tenía conocimiento alguno del cierre de mercado realizado por la apelada. Por ende, solicitó la reconsideración de la decisión de Integrand. No obstante, el 20 de noviembre de 1998, el Sr. McTeddy Montañez, ajustador de Integrand, le notificó al Sr. Abaunza que su reclamación no procedía por su póliza haber sido cancelada desde el 28 de agosto de 1998.
Se desprende de la sentencia apelada que el TPI consideró que el hecho de que Seguros Calderón hubiese reinstalado la póliza de los apelados en dos ocasiones distintas a pesar de que el Sr. Abaunza había pagado las correspondientes primas tardíamente, creó en los apelados la creencia de que aún estando las primas vencidas, ellos podían lograr la reinstalación de su póliza mediante la entrega de pagos tardíos. Ante ello, Integrand alega que el TPI falló en reconocer que los dos pagos previamente aceptados se dieron dentro del período de gracia (diez días) o la alegada discreción de la apelante por lo cual no podían ser caracterizados como la costumbre entre las partes.
Por su parte, los apelados arguyen que las doctrinas de renuncia e impedimento son de aplicación a Integrand debido a que ellos fueron inducidos a creer por el requerimiento de pago que les hiciera Seguros Calderón -agente autorizado de Integrand- que en cuanto pagaran las primas adeudadas a Progressive, su póliza sería reinstalada. Por tal razón, aducen que tenían razones fundadas para exigir dicha reinstalación porque los actos de Seguros Calderón les crearon esa expectativa. Tienen razón los apelados.
Como mencionáramos, la aplicación de las mencionadas doctrinas requieren que evaluemos si existió de parte de Seguros Calderón -agente autorizado cuyos actos y decisiones vinculan a Integrand-, la intención de no *711 invocar la cancelación de la póliza de los apelados por falta de pago.
Del testimonio del Sr. Morales -el corredor de seguros de los apelados-, surge que, en días anteriores al 18 de septiembre de 1998, éste recibió instrucciones por parte del Sr. Calderón a los efectos de que realizara gestiones de cobro con el Sr. Abaunza “para poder reinstalar la póliza, para que se pusiera al día con la financiera”. Conforme a ello, el Sr. Morales declaró que se comunicó con el Sr. Abaunza “para explicarle la situación de la financiera, del atraso de la póliza y la pusiera al día”. Dicho testigo también afirmó que tenía conocimiento de que Seguros Calderón había emitido un Aviso de Cancelación el 18 de agosto de 1998 a ser efectivo el 28 de agosto de igual año, pero que había sido informado por el Sr. Calderón que la póliza de los apelados estaba “para crédito”. Además declaró que anteriormente había realizado esas gestiones para Seguros Calderón y que, por ellas, se habían reinstalado pólizas ya canceladas. Afirmó que era uso y costumbre reinstalar una póliza luego de que se emitiera un aviso de cancelación, siempre y cuando el pago se diera dentro de los treinta días posteriores a su fecha de efectividad. En cuanto a las gestiones específicas que realizó con los apelados, el Sr. Morales declaró que el 18 de septiembre de 1998, el Sr. Abaunza le entregó un cheque por la cantidad de $762.26 a favor de Progressive y que, en esa misma fecha, lo llevó personalmente a dicha financiera. 
Por su parte, el Sr. Calderón declaró que como agente autorizado de Integrand tiene la potestad de determinar la vigencia de los contratos de pólizas que suscribe. Aceptó además que le requirió al Sr. Morales que procurara el pago atrasado de los apelados con el propósito de que su póliza no se cayera por falta de pago. También corroboró lo declarado por el Sr. Morales en cuanto a que cuando se emite un Aviso de Cancelación por falta de pago, el asegurado tiene treinta días para hacer el correspondiente pago. Explicó que si dicho asegurado realiza el pago dentro del período de gracia, es decir, en los primeros diez días de la emisión del aludido aviso, su póliza se reinstala de manera automática y su vigencia se mantiene inalterada. Si el asegurado realiza el pago luego de transcurrido el período de gracia, pero dentro de los treinta días posteriores a la efectividad del aviso de cancelación, su póliza se reinstala de manera limitada. Ello significa que la vigencia de la póliza se suspende por el tiempo transcurrido entre la fecha de efectividad del aviso de cancelación y la entrega del pago por parte del asegurado. Asimismo, la vigencia de la póliza se extiende por la cantidad de días en que fue suspendida. En relación al caso ante nos, el Sr. Calderón declaró que los apelados tenían hasta el 28 de septiembre de 1998 para efectuar su pago y, de esa manera, obtener la reinstalación limitada de su póliza. Surge del récord ante nos que dicho pago fue entregado por el Sr. Morales en las oficinas de Progresive entre las 9:30 y 10:00 de la mañana el 18 de septiembre de 1998. Por tal razón, en esa misma fecha, Progressive solicitó la reinstalación de la póliza del Sr. Abaunza. Ahora bien, el Sr. Calderón declaró que, a pesar de tener la facultad para ello, decidió no reinstalar la póliza de los apelados por entender que, a la luz de los daños sufridos por el Restaurant El Cielito debido al paso del huracán Georges el 21 de septiembre de 1998, le correspondía a Integrand tomar la decisión de reinstalar la póliza. 
Así pues, se desprende del testimonio tanto del Sr. Morales como del Sr. Calderón la clara intención de Seguros Calderón de reinstalar la póliza de los apelados en cuanto Progressive recibiera su pago, aun cuando éste se efectuara posteriormente a la fecha de efectividad del aviso de cancelación. Sin embargo, una vez efectuado el pago, Seguros Calderón decidió no reinstalar la póliza porque ya conocía de los daños recibidos por el negocio de los apelados. Al así hacerlo, Seguros Calderón no actuó conforme al derecho vigente.
Es norma establecida en el derecho de seguros que cuando una compañía de seguros o su agente autorizado solicita el pago de las primas de una póliza, está a su vez reconociendo la validez de la misma. Así pues, una compañía de seguros no puede solicitar dichos pagos y, simultáneamente, aducir que la póliza fue cancelada por falta de pagos. Mills Holmes, E. Holmes’ Appleman on Insurance 2d, Vol. Five, §§ 24.1- 33.19, Law of Insurance Premiums, Lexis Law Publishing, 1998, pág. 443. Por ende, cuando un agente autorizado, a sabiendas de que tiene el derecho de cancelar una póliza por falta de pagos, le requiere los pagos adeudados al asegurado, lo que hace es renunciar a dicho derecho. En el caso ante nos, no cabe duda de que la intención de *712 Seguros Calderón siempre fue reinstalar la póliza de los apelados luego de que éstos realizaran sus correspondientes pagos, tal cual hiciera en dos ocasiones anteriores.
No obstante, Integrand alega que como el Sr. Abaunza realizó su último pago adeudado fuera del período de gracia, Seguros Calderón carecía de facultad para evaluar la solicitud de reinstalación de los apelados debido a que para cuando recibió la misma el 28 de septiembre de 1998, él ya tenía conocimiento de “que la póliza había sido cancelada un mes antes, de la morosidad previa del [Sr. Abaunza] y sabía de la decisión previa de Integrand de cerrar el mercado”. Así que, para lograr tal reinstalación, era necesario que Integrand ejerciera su discreción y revaluara el riesgo de dicha póliza. Tales argumentos no están sostenidos por la prueba ante nos.
En primer lugar, si bien es cierto que Seguros Calderón recibió la solicitud de reinstalación el 28 de septiembre de 1998, ésta fue emitida por Progressive en la misma fecha en que recibió el pago de los apelados, es decir, el 18 de septiembre de 1998. En su testimonio, el Sr. Calderón manifestó que, a la hora de evaluar una solicitud de ese tipo, se toma en cuenta la fecha de su emisión y no la de su recibo. Así las cosas, para el momento en que los apelados efectuaron su pago, no había transcurrido un mes, sino veinte días. También es cierto que el Sr. Calderón tenía conocimiento de la morosidad previa de los apelados, pero eso no lo inhibió de requerirles el pago de sus primas atrasadas a través de su corredor. Además, recordemos que en una ocasión anterior, Seguros Calderón había reinstalado de manera limitada la póliza de los apelados a pesar de que éstos habían efectuado el correspondiente pago tres días después de transcurrido el período de gracia. En ese momento, éste no envió la solicitud de reinstalación a Integrand ni tampoco descansó en la discreción de ella para tomar su decisión. Además, el propio Sr. Calderón aceptó en su testimonio en corte que el contrato suscrito entre él y la apelada le daba facultad para tomar la decisión de reinstalar la póliza de los apelados y que, si no hubiera sido por los daños recibidos por el Restaurant El Cielito, era muy probable que él hubiera reinstalado la póliza. 
Es importante también señalar que la Sra. Rivera, quien era la Gerente del Departamento de Suscripción de Integrand al momento de los hechos, declaró que Seguros Calderón tenía la facultad para reinstalar la póliza de los apelados después del período de gracia y que desconocía las razones por las cuales el caso había sido transferido a la apelada. 
Sobre la alegada decisión de Integrand de cerrar el mercado en la mañana del 18 de septiembre de 1998, cabe indicar que ninguno de los testimonios vertidos en corte pudieron establecer preponderantemente que Seguros Calderón tenía conocimiento de dicho cierre antes de procurar el pago de los apelados o de que éstos efectuaran el mismo. Específicamente, el Sr. Calderón declaró que no recordaba haber recibido llamada telefónica alguna de parte de Integrand notificándole el cierre del mercado. Lo que sí quedó establecido por la prueba de récord es que el 28 de mayo de 1998, Integrand envió una carta circular a todos sus agentes autorizados mediante el cual les notificó que debían cerrar el mercado en cuanto el U.S. Weather Bureau emitiera un aviso de huracán. En el caso ante nos, dicho aviso se emitió el 19 de septiembre de 1998, es decir, un día después de que los apelados efectuaron su pago y éste hubiese sido recibido por Progressive. En consecuencia, carece de fundamento lo alegado por Integrand en cuanto a que el Sr. Calderón le envió la solicitud de reinstalación de la póliza de los apelados por él carecer de autoridad para atenderla.
Ahora bien, en cuanto a la discreción tanto de Seguros Calderón como de Integrand para reinstalar la póliza de los apelados, advertimos que el ejercicio de la misma no puede ser arbitrario, caprichoso ni de mala fe. Russ, L. & Segalla T. Couch on Insurance 3D, West Group, 1999, págs. 33-6. En el caso ante nos, Seguros Calderón y la apelada ciertamente tenían un grado de discreción para decidir si reinstalaban o no la póliza del Sr. Abaunza y la Sra. Torres a causa de sus atrasos en los pagos de la prima. Sin embargo, la prueba ante nos sostiene que, por regla general, cuando una compañía de seguros evalúa la solicitud de reinstalación de una póliza cancelada por falta de pago, no se tiene que hacer una nueva evaluación de riesgo. Así lo manifestó el Sr. *713 Calderón cuando a preguntas de la representación legal de Integrand respondió que cuando se habla de “cancelaciones por falta de pago únicamente [...] no hay que volver a evaluar el riesgo”, sino que “[s]e evalúa, por ejemplo, si [...] una póliza que se ha[...] cancelado muchísimas veces por falta de pago, [...] ya no nos interesa mantener ese riesgo porque [...] es muy oneroso mantener esa cuenta 
Asimismo, el Sr. Rodríguez, quien fuera el Vicepresidente de Suscripción de Integrand a la fecha de la reclamación de los apelados, declaró que para decidir sobre la reinstalación de una póliza cancelada por falta de pago se considera no tan sólo la frecuencia de las cancelaciones por falta de pago, sino que, en caso de un evento catastrófico como sería el paso de un huracán, se toma en cuenta el tiempo transcurrido entre la emisión del aviso de cancelación y la solicitud de reinstalación. Si había transcurrido uno o dos meses desde la efectividad del aviso de cancelación, Integrand solía denegar la reinstalación. El Sr. Rodríguez declaró que en el caso de la póliza de los apelantes, se tomó en cuenta que alegadamente había transcurrido un mes desde la efectividad del aviso de cancelación y la solicitud de reinstalación. Sin embargo, como ya hemos dicho, los apelados efectuaron sus pagos adeudados veinte días después de la efectividad del aviso de cancelación de su póliza y dentro de los treinta días para que la misma pudiera ser reinstalada, tal cual les fuera requerido por Seguros Calderón. Ello, unido a lo declarado por el Sr. Calderón a los efectos de que si no hubiera tomado conocimiento de los daños sufridos por el Restaurant El Cielito, él mismo hubiese reinstalado la póliza de los apelados, nos mueve a concluir que, en efecto, el TPI actuó correctamente al determinar que, de no haber sido del conocimiento de esos daños, Integrand hubiera reinstalado la póliza sin inconveniente mayor alguno. 
Además, alega la apelante que el TPI incidió cuando aplicó al caso ante nos lo resuelto por nuestro Tribunal Supremo en Rosario v. ATL. Southern Ins. Co. of P.R., 95 D.P.R. 759 (1968). A través del mismo, nuestro más Alto Foro resolvió que “la costumbre del agente de cobrar primas vencidas constituye una renuncia de la cláusula de caducidad por falta de pago, aun si se paga luego de expirado el periodo de gracia y aunque la póliza diga lo contrario”, Rosario v. ATL. Southern Ins. Co. of P.R., supra, pág. 767. Para llegar a su decisión, el Tribunal Supremo tomó en cuenta que el agente de la compañía aseguradora en dicho caso hacía los cobros de manera irregular, que el último cobro se hizo luego de la muerte del asegurado, a sabiendas del agente y que el asegurado no tenía conocimiento de la dirección a la que tenía que enviar sus pagos. Aduce Integrand que dicha norma no es aplicable porque ninguno de los elementos particulares utilizados por el Tribunal Supremo para llegar a su decisión están presentes en el caso de autos. Tampoco tiene razón.
Ciertamente, la prueba ante nos establece la conducta de parte de Seguros Calderón de permitirle al Sr. Abaunza pagar sus primas mediante pagos tardíos aun fuera del período de gracia, siempre y cuando éstos se realizaran dentro de los treinta días posteriores a la efectividad de su aviso de cancelación. Por ello, entendemos que es razonable la creencia de los apelados a los efectos de que si pagaban sus primas atrasadas fuera del período de gracia, su póliza sería reinstalada de manera limitada. Después de todo, no hallamos cuál otra razón podría tener Seguros Calderón para requerir los pagos de una póliza cancelada si no era para reinstalarla.
Por otra parte, la apelante aduce que el Sr. Abaunza- con el conocimiento de la inminencia del paso de un huracán-, intentó revitalizar una cubierta que sabía estaba cancelada para protegerse del mismo. Pasa por alto Integrand que el pago de los apelados se dio luego de que Seguros Calderón hiciera gestiones para ello. Así que el conocimiento general que la apelada nos solicita que le imputemos a los apelados sobre el paso del mencionado huracán también podría imputársele a su agente autorizado quien, a pesar de ello, requirió los pagos tardíos con el propósito de reinstalar la póliza. Además, si bien es cierto que en este caso los apelados siempre tuvieron conocimiento sobre cómo y a dónde tenían que efectuar sus pagos y que, en tres ocasiones distintas, fallaron en así hacerlo, no es menos cierto que en esas mismas ocasiones, Seguros Calderón, a través un corredor, hizo gestiones para cobrar las primas adeudadas, tal cual es el uso y costumbre en la industria de seguros. A la luz de los hechos esbozados, no puede Integrand pretender que este tribunal pase por alto la razonabilidad de la creencia de los apelados de que sus pagos habían logrado la reinstalación de su póliza y que, por ende, su negocio Restaurant El Cielito estaba cubierto por ella al momento del paso del huracán Georges.
*714 Por último, arguye Integrand que la sentencia apelada tiene el efecto de obligarle a suscribir un nuevo contrato de seguros contrario a su decisión de negocios válida y legítima de no asegurar un riesgo. Tampoco tiene la razón. El propio presidente de Integrand, el Sr. Salgado, declaró que cuando se pagan primas adeudadas dentro de los treinta días posteriores a la fecha de efectividad de la cancelación de una póliza, el Código de Seguros permite que se reinstale la póliza ya suscrita. Si por el contrario, las primas se pagan luego del aludido período de treinta días es necesario que tanto el asegurado como la compañía aseguradora suscriban un nuevo contrato. Recordamos que en el caso ante nos, los apelados efectuaron su pago apenas veinte días después de la efectividad de la cancelación de su póliza, por lo cual Integrand podía reinstalar la misma sin necesidad de otorgar un nuevo contrato de seguros. Además, como mencionáramos, usualmente dicha reinstalación no requiere una nueva evaluación de los riesgos, tal como manifestara el Sr. Calderón en su testimonio.
En consecuencia, somos de la opinión de que en el momento en que Seguros Calderón realizó gestiones para obtener el pago de las primas atrasadas de los apelados, creó en ellos la expectativa razonable de que si efectuaban los pagos requeridos, su póliza sería reinstalada de manera limitada. Así pues, entendemos que los actos de Seguros Calderón -los cuales vinculan a Integrand-, constituyeron una renuncia a cancelar la póliza de los apelados por falta de pago. Resolver lo contrario significaría abrirle las puertas a una compañía de seguros para que después de requerir y obtener el pago de primas atrasadas, decida cancelar la póliza por falta de pago sólo porque advino en conocimiento de que, posteriormente, el asegurado sufrió daños. Tal conducta no es avalada por nuestro ordenamiento ni es afín a la equidad que impera en el derecho de seguros.
Finalmente, nos resta discutir el ultimo error señalado por Integrand. En éste, aduce que el TPI erró en su valoración de las alegadas angustias mentales sufridas por los apelados. Tiene razón la apelante.
Como hemos dicho, por regla general, nuestro ordenamiento no contempla la concesión de una partida de daños por incumplimiento contractual. Sin embargo, nuestro Tribunal Supremo ha reconocido que sólo se puede conceder dicha partida cuando los daños recibidos hubiesen sido previsibles por la parte que haya incurrido en un incumplimiento contractual.
De la sentencia apelada no surge qué prueba fue considerada por el TPI para otorgar $50, 000 a los apelados por concepto de sus angustias mentales. Ciertamente, se desprende de los testimonios tanto del Sr. Abaunza como de la Sra. Torres que el hecho de que Integrand se negara a reinstalar la póliza de los apelados les angustió y les obligó a recurrir a amigos y familiares para obtener el dinero necesario y reconstruir a El Restaurant El Cielito, el único negocio que les sostenía económicamente. Específicamente, la Sra. Torres declaró que cuando se enteró de que la apelada no iba a pagarles la reclamación incoada, lloró y sintió que el mundo se le había acabado. Sin embargo, de ese mismo testimonio surge que en un período de dos meses el negocio de los apelados pudo ser reconstruido y abrió sus puertas al público. 
Recordamos que a la hora de evaluar los daños, los tribunales estamos obligados a hacerlo de manera tal que honremos el propósito remediador y no punitivo de la responsabilidad civil. De igual manera, la cuantía otorgada debe ser razonable y guardar proporción con el acto que se pretende remediar.
Adviértase que el TPI le concedió a los apelados $50,000 por concepto de las angustias mentales recibidas. Evaluada la prueba ante nos, entendemos que la cuantía concedida por dicho tribunal es exageradamente alta. La prueba desfilada por los apelados para dicha partida sostiene su procedencia, mas no el monto. Éstos no aportaron prueba de daños morales profundos que requiriesen asistencia siquiátrica o médica, ni la presencia de condiciones permanentes como consecuencia de la negativa de Integrand de reinstalarles su póliza de seguros. Por ello, estimamos que la cantidad de $16,000 es una compensación razonable por las angustias mentales sufridas por los apelados a consecuencia del incumplimiento contractual de la apelada.
*715 IV
Por los fundamentos expuestos, se modifica la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 9 de septiembre de 2005 y notificada el 12 de igual mes y año, a los únicos efectos de reducir a $16,000 la partida por angustias mentales concedida por dicho tribunal a los apelados. Así modificada, se confirma.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 11
1. Transcripción del juicio en su fondo el 22 de septiembre de 2004, págs. 149-153.
2. Transcripción del juicio en su fondo el 21 de septiembre de 2004, págs. 104-105. Véase además el apéndice de los apelados, pág. 85.
3. Apéndice de los apelados, pág. 97.
4. Transcripción del juicio en su fondo el 21 de septiembre de 2004, pág. 26, líneas 12-13.
5. Transcripción del juicio en su fondo el 21 de septiembre de 2004, pág. 26, líneas 16-18.
6. Transcripción del juicio en su fondo de 21 de septiembre de 2004, pág. 29, líneas 6-8. Cabe señalar que en su testimonio, el Sr. Morales explicó que, en la industria de seguros, cuando se dice que una póliza está para crédito significa que se ha emitido un aviso para su cancelación, pero que no han transcurrido 30 días desde la efectividad del mismo. Así pues, si en ese período el asegurado paga a la aseguradora, la póliza puede ser reinstalada. Por el contrario, cuando se dice que una póliza “se tiró a crédito”, ello significa que han transcurrido 30 días desde la fecha de efectividad del aviso dé cancelación sin que el asegurado hubiese realizado pago alguno, por lo cual la póliza ya no puede ser reinstalada. Véase págs. 44-45 de la mencionada transcripción.
7. Transcripción del juicio en su fondo de 21 de septiembre de 2004, pág. 31, líneas 11-20.
8. Transcripción del juicio en su fondo de 21 de septiembre de 2004, págs. 33-34.
9. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 94.
10. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 99.
11. Transcripción del juicio en su fondo el 22 de septiembre de 2004, págs. 100-101.
12. Id.
13. Apéndice de los apelados, pág. 98.
14. Apéndice de los apelados, pág. 130.
15. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 110.
16. Recurso de la apelante, pág. 14.
17. Transcripción del juicio en su fondo el 22 de septiembre de 2002, pág. 154, líneas 6-9.
*716 18. Transcripción del juicio en su fondo el 22 de septiembre de 2004, págs. 110-111.
19. Transcripción del juicio en su fondo el 23 de septiembre de 2004, pág. 78.
20. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 127.
21. Apéndice de los apelados, pág. 39.
22. Apéndice de los apelados, págs. 44-74.
23. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 147, líneas 13-24.
24. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 148, líneas 3-8.
25. Transcripción del juicio en su fondo el 22 de septiembre de 2004, pág. 111-112.
26. Sobre el conocimiento de Integrand en relación a los daños recibidos por el Restaurant El Cielito, baste reiterar que un ajustador de la apelante evaluó los mencionados daños y realizó un estimado de los mismos. Apéndice de los apelados, pág. 85.
27. Transcripción .del juicio en su fondo el 22 de septiembre de 2004, pág. 196, líneas 4-10.
28. Transcripción-dél juicio, en su fondo el-21 de septiembre de 2004, págs. 106-107.
29. Transcripción, del juicio en su fondo el 21 de septiembre de 2004, págs. 141-142.
30. Transcripción def juicio en su fondo el 21 de septiembre de 2004, pág. 142.